## 39437. KILGORE v. THE STATE.

BELL, Justice.

Kilgore was convicted in the Dade County Superior Court on April 29, 1982 for the murder of Roger Norman and was given a life sentence. He appeals.

In the early morning hours of July 8, 1981, the victim, Roger Norman, was traveling south on Interstate 59 (I-59) through Dade County to his home in Alabama. While driving, he was shot in the head and killed. George Lee, a trucker, testified that on this morning he was driving north on I-59 when he observed two cars traveling beside each other going south. He testified that he heard a shot and saw Norman's car veer off the highway. Norman was driving a 1980 burgundy colored Lincoln.

At trial, the state introduced evidence of a conspiracy to kill Roger Norman. In particular, it introduced evidence of three previous attempts on Norman's life. As to the first attempt, David Oldaker testified that on February 6, 1981 Greg Benton, his cousin, asked him to go with him to Menton, Alabama, Norman's home. He testified that the purpose of the trip was to kill Norman and that Benton told him a crippled man named Tom, who sold pharmaceuticals and lived in Soddy-Daisy, Tennessee, was the man who wanted Norman killed. This testimony was admitted over the hearsay objection of defense counsel. Tom Carden, who died on July 16, 1981, was Norman's brother-in-law and lived in Soddy-Daisy. He was a paraplegic. Oldaker and Benton went to Norman's home, where they unsuccessfully attempted to kill him. Kilgore was in no way implicated in this attempt.

Evidence did specifically connect Kilgore with the second attempt. Ed Williams, an employee of a truck stop located just off the interstate near Trenton, Georgia, testified that on the evening of June 8, 1981 he saw two cars traveling close to each other while crossing a bridge over I-59; that he heard sounds like a car backfiring; and that Norman's car pulled into the truck stop while the other car turned north on I-59. Norman, who had been on his way home from

work, had been shot in the upper back. Sheriff Steele of Dade County testified that based on what Norman told him, he posted a lookout for a 1962 or 1963 Rambler with a dark bottom, white top, and Tennessee tags.

Constance Chambers, Kilgore's ex-girl friend who lived with him from April through September of 1981, testified that on June 8, 1981, Kilgore and his cousin, Lee Berry, borrowed her 1964 Rambler. It had a dark green body, white top, and Tennessee tags. She testified that Kilgore returned to her apartment around 4:00 a.m. the next morning and told her they had killed a man near Trenton, Georgia. Later that day, Chambers testified that Kilgore received a phone call from Tom Carden, during which she heard Kilgore say "apparently we didn't get him" and "there is no need in getting anybody else to do it, we'll take care of it." After this call, Chambers accompanied Kilgore to a wooded area near Tom Carden's trailer where Kilgore picked up nine hundred dollars.

Concerning the circumstances leading up to Norman's death on July 8, 1981, Chambers' testimony shows the continuation of a conspiracy to kill Norman. She testified that on June 15, 1981 Kilgore received a phone call from Carden, during which she heard Kilgore tell Carden he needed more money to obtain a faster car and another man to help him. Shortly thereafter, Kilgore went to Carden's and picked up fifteen hundred dollars. Chambers also testified that on July 5, 1981 Kilgore received another call from Carden, after which she and Kilgore drove to Carden's trailer where Kilgore took fifteen thousand dollars from the mailbox. According to her testimony, they left Carden's and drove to a V.F.W. post where they met a friend of Kilgore's, Bob Price. She testified that Kilgore took a rifle out of his car, put it in Price's van, and left with him, while she drove home alone. The next day Kilgore told Chambers that he and Price had attempted to kill a man between Knoxville and Chattanooga but were unsuccessful. Norman had a furniture store in Knoxville, and Chambers testified that Kilgore and Price made the attempt after getting directions to the victim's place of business. Chambers' description of the location they were directed to fits Norman's store.

Chambers testified that on July 7, 1981, the day preceding the murder, Kilgore and Price left her apartment about 6:00 p.m., each in a separate vehicle but driving in the same direction. She did not see Kilgore until noon the next day, July 8, when, she testified, he returned driving a blue Lincoln. She testified that at about 3:00 p.m. that day she and Kilgore left to go to Florida, and Chambers' mother testified that before they left Kilgore gave her sixty dollars from a wad of money he said contained five thousand dollars.

Kilgore and Chambers spent several days in Florida, and

Chambers testified that on the way home Kilgore told her that "all mighty hell is going to break loose, . . . we killed a man"; that they [he and Price] had killed him on I-59 just outside of Trenton, Georgia; that the man had been driving a new burgundy colored car; that the car left the road; that he was sure the man did not survive this time; and that the murder was over a drug deal.

On July 16, 1981, Tom Carden died at his trailer in Soddy-Daisy. No autopsy was performed, and the death certificate lists the cause of death as acute fulminating respiratory infection. Dr. Dawson of the Georgia Crime Laboratory testified that generally this means the deceased died from asphyxiation, probably from fluid in the lungs. He testified that an overdose of depressant drugs usually causes death by asphyxiation, and that if it was only known that a death was caused by asphyxiation, there would be no way to know the mechanism which triggered the asphyxiation. In one of Kilgore's statements, he said that Brenda Norman, Carden's sister, told him there was something suspicious about his death. Chambers testified that Kilgore told her he and Price had given Carden a drug overdose because "he knew too much."

Several statements of Kilgore were admitted after a determination that they had been freely and voluntarily given. In one, Kilgore first stated that "this is one rap I'm not going to take myself, somebody else is going down with me," but later stated he "was going to keep his mouth shut, because he didn't want to end up in a fifty-five gallon drum." In another statement, Kilgore said that he was a business associate of Tom Carden and Roger Norman, that he was in their employment and was participating in a drug smuggling operation, but that he was in Florida when the deaths of Carden and Norman occurred. In yet another statement, Kilgore stated that before he left to go to Florida, he picked up two thousand dollars from Carden for "look alike type of drugs"; that he worked for Carden, "trading synthetic type [sic] of drugs for real drugs"; and that he went to work for Norman through Carden, doing "basically the same thing, swapping good dope for bad dope." In all of his statements, Kilgore denied any knowledge of the deaths of Norman and Carden.

Agent Bonnell of the Georgia Bureau of Investigation testified that while trying to locate Bob Price, he received information that Price might be living at the Norman residence with the victim's wife. As a result, a search of the residence was conducted and partially burned pieces of letters were recovered from a garbage can. One had a sticker with Price's name on it, another contained the words "Brenda, things are worse than we thought. Do not meet or trust Auman, I will call you tonight, the G.B.I. has my photo and A.P.B., call you tonight,

love . . .," and another was signed "Bob."

Kilgore appeals and enumerates fifty-one errors.

1) In his first four enumerations of error, Kilgore contends that the evidence was insufficient to satisfy the requirements of Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). Kilgore bases this contention on several different arguments.

a) First, he contends that the only evidence linking him to the crime is the uncorroborated testimony of an accomplice, Constance Chambers, which, as a matter of law, is insufficient to sustain a conviction. OCGA § 24-4-8 (Code Ann. § 38-121). He argues that Chambers was an accomplice since, among other things, she accompanied him to retrieve money from Carden; since after June 9, 1981 she knew that Kilgore had tried to kill a man; and since she went with him to Florida. We disagree and hold that these circumstances do not elevate Chambers to the status of an accomplice. *Moore v. State,* 240 Ga. 210 (1) (240 SE2d 68) (1977); *Ford v. State,* 232 Ga. 511 (7) (207 SE2d 494) (1974). There is no evidence that Ms. Chambers was a party to the crime within the meaning of OCGA § 16-2-20 (Code Ann. § 26-801). She did not know who the intended victim was, or when the various attempts on his life were to be made, and she did not in any way participate in or encourage the murder of Roger Norman. Consequently, she is not an accomplice within the meaning of OCGA § 24-4-8 (Code Ann. § 38-121). *Moore v. State,* supra; *Ford v. State,* supra.

b) Kilgore also argues that Chambers' testimony that he told her "all mighty hell is going to break loose, . . . we killed a man" is the only evidence linking him to the crime, amounts only to an admission, and is insufficient to convict because it is uncorroborated. He reasons that if an uncorroborated confession is insufficient to convict, an uncorroborated admission is likewise insufficient. OCGA § 24-3-53 (Code Ann. § 38-420). In this argument, Kilgore overlooks crucial aspects of his statement to Chambers. He also described the location of the murder, on I-59 just outside of Trenton, Georgia; the victim's car, new and burgundy colored; and the fate of the car, i.e., that it left the road. Pretermitting the question of whether this voluntary admission of guilt to his girl friend constitutes a confession, we find that this argument has no merit. First, there is evidence corroborating the statement. The murder did take place on I-59 near Trenton, Georgia; Norman was driving a 1980 burgundy colored Lincoln; and the car left the road and overturned. *Fields v. State,* 232 Ga. 723 (2) (208 SE2d 822) (1974); *Gilder v. State,* 219 Ga. 495 (2) (133 SE2d 861) (1963). Second, the appellant really seems to be claiming that there was insufficient evidence to sustain a conviction under Jackson v. Virginia, supra. However, we do not find this to be the case.

See Division 1 (d), infra.

c) Kilgore apparently contends that the state did not prove he actually committed the murder, and that consequently, it must have been proceeding on the theory that his guilt was based upon a conspiracy; yet, he argues, the state did not prove a conspiracy because it did not prove an overt act occurred in Georgia. OCGA § 16-4-8 (Code Ann. § 26-3201). We also find this argument to be without merit. Again, this argument is predicated on the assumption that there was insufficient evidence to convict Kilgore of the murder of Norman. However, we disagree. See Division 1 (d), infra. Also, the conspiracy was merely an evidentiary tool used by the state to help prove Kilgore guilty of the murder of Norman. In fact, Kilgore could not have been tried for conspiracy since the object of the conspiracy was completed. *Roberts v. State,* 242 Ga. 634 (2) (250 SE2d 482) (1978); *Scott v. State,* 229 Ga. 541, 544 (192 SE2d 367) (1972).

d) Although the appellant does not otherwise argue that the evidence does not support the verdict, we have reviewed the record and transcript and conclude that there is sufficient evidence upon which a rational trier of fact could reasonably have found Kilgore guilty of the murder of Norman beyond a reasonable doubt. Jackson v. Virginia, supra; *Strickland v. State,* 250 Ga. 624 (1) (300 SE2d 156) (1983). See Division 3 (c), infra.

2) In several related enumerations of error, Kilgore argues that the trial court erred in refusing to grant several motions for mistrial made after what he contends were instances where state's witnesses prejudicially placed his character in issue.

a) He first complains that a Tennessee detective improperly placed his character in issue by answering unresponsively on cross-examination that he had been investigating Kilgore in four or five other cases. We disagree. Before eliciting the above response, defense counsel repeatedly asked the detective about his involvement in the case and about how he had acquired information concerning Kilgore and Constance Chambers. Thus, the record reflects that the answer was responsive and was the result of a thorough and argumentative cross-examination. Consequently, Kilgore has no basis to complain of its admission. *Thomas v. State,* 213 Ga. 237 (98 SE2d 548) (1957).

b) Kilgore also contends that the trial court erred in not granting a motion for mistrial on the basis that his character was improperly placed into evidence by the following colloquy between defense counsel and Constance Chambers: "Q. Now, did you or didn't you tell Tom Fox about this alleged murder in August? A. At that time, I was more concerned over the safety of my children. I had three men come to my house and gave [sic] me one hour to find out what he

[the appellant] had done with fifty thousand quaaludes, at that time, he [the appellant] was sitting in the Hamilton County Jail for rape, and I didn't have any other choice." The record shows that this answer was the result of lengthy questioning concerning *when* Chambers first told the police of the admission Kilgore made to her on the way back from Florida. Chambers, a laywitness unfamiliar with rules of evidence, see *Sabel v. State,* 250 Ga. 640 (5) (300 SE2d 663) (1983), explained *why,* instead of when, she went to the police. Kilgore's motion for mistrial was based on her reference to the crime of rape and not on the reference to drugs, since unobjected-to testimony concerning drugs had previously been elicited.

The grant of or refusal to grant a motion for a mistrial lies within the sound discretion of the trial court, and the exercise of this discretion will not be disturbed unless the grant of a mistrial is essential to preserve the right to a fair trial. *Ladson v. State,* 248 Ga. 470 (12) (285 SE2d 508) (1981); *Baker v. State,* 245 Ga. 657 (4) (266 SE2d 477) (1980). We find that the curative instructions given by the trial court, especially when considered in light of the circumstances surrounding the giving of the statement, were sufficient to insure Kilgore a fair trial. *Sabel v. State,* supra, p. 644; *Baker v. State,* supra, p. 663. Therefore, the trial court did not err in refusing to grant a mistrial.

Furthermore, Kilgore has waived his right to object to this testimony on appeal by failing to renew his motion for a mistrial after the curative instructions by the trial court. *Jackson v. State,* 248 Ga. 480 (2) (284 SE2d 267) (1981).

3) In several related enumerations of error, Kilgore contends that the introduction of evidence concerning the February 6 and June 8, 1981 attempts on Norman's life and the alleged murder of Tom Carden was prejudicial error.

a) First, we find that the evidence implicating Kilgore in the June 8, 1981 attempt on Norman's life was properly admitted. Generally, evidence of other criminal acts by a defendant is inadmissible because it tends to place the defendant's character in issue. *Walraven v. State,* 250 Ga. 401 (4) (6) (297 SE2d 278) (1982); *State v. Johnson,* 246 Ga. 654 (1) (272 SE2d 321) (1980); OCGA § 24-9-20 (Code Ann. §§ 38-415, 38-416). However, exceptions to this rule have arisen, and evidence of independent crimes is admissible for limited purposes if two conditions are met: " 'First, there must be evidence that the defendant was in fact the perpetrator of the independent crime. Second, there must be sufficient similarity or connection between the independent crime and the offense charged, that proof of the former tends to prove the latter. [Cits.]' " *State v. Johnson,* supra, p. 655. If these conditions are satisfied, evidence

concerning the independent crimes may be admitted for the purposes of showing, among other things, identity, motive, plan, scheme, bent of mind, intent, and course of conduct. *Walraven v. State,* supra, p. 408; *State v. Johnson,* supra, p. 655; *Hamilton v. State,* 239 Ga. 72, 73 (235 SE2d 515) (1977).

Here, there is sufficient evidence to show that Kilgore was in fact the perpetrator of the June 8, 1981 attempt on Norman's life. Chambers testified that Kilgore and Berry left that evening in her 1964 Rambler that has a dark body, white top, and Tennessee tags, and the car from which shots were fired at Norman fit that description precisely. Chambers also testified that later that evening ·Kilgore told her he had killed a man. She also overheard a conversation between Kilgore and Carden the next day in which she testified Kilgore said "apparently we didn't get him" and "there is no need in getting anybody else to do it, we'll take care of it."

In addition, this attempt on Norman's life is similar and connected to the offense for which Kilgore was tried. Both crimes involved the same victim and the same source of the scheme to kill the victim, Tom Carden, and both were executed in the same fashion, by driving close to the victim's car on I-59 and shooting him. Thus, the evidence of the June 8, 1981 attempt was properly admitted as it was clearly relevant to identity, motive, and plan or scheme. *Walraven v. State,* supra, p. 408; *State v. Johnson,* supra, p. 655.

b) Closely related to the above enumeration is Kilgore's contention that the state improperly placed his character in issue by eliciting the response from Chambers that Kilgore told her at Carden's funeral that he and Price had overdosed Carden because "he knew too much."

Evidence of subsequent independent crimes can be admitted for limited purposes if the conditions noted in Division 3 (a), supra, are met. 29 AmJur2d 378, Evidence, § 329. Here, Kilgore argues that there was insufficient proof to establish that any crime occurred because the death certificate showed the death to have resulted from natural causes. In this regard, he argues that other evidence, such as the testimony of Dr. Dawson of the Georgia State Crime Lab and that of Chambers, cannot be used to refute the cause of death listed on the death certificate. We disagree and find that such testimony was properly introduced as evidence of the cause of death. See, *Independent Life &c. Ins. Co. v. Branton,* 236 Ga. 514 (224 SE2d 380) (1976); *State Mut. Ins. Co. v. Sullens,* 147 Ga. App. 59, 61 (248 SE2d 18) (1978).

In deciding whether to admit evidence of independent crimes, it is not necessary for the state to prove beyond a reasonable doubt that the defendant was the perpetrator or that the crime occurred.

*Wallace v. State,* 246 Ga. 738 (5) (273 SE2d 143) (1980). We find that the testimony of Chambers, when combined with the testimony of Dr. Dawson that the mechanism triggering an asphyxial death would be unknown absent some inquiry, is sufficient to prove the other crime and that Kilgore was the perpetrator. The second condition for the admission of independent crimes was also satisfied as the death of Carden is logically connected to the murder of Norman as being Kilgore's attempt to conceal the crime for which he was charged.

Moreover, we conclude that the evidence was properly admitted for the purpose of proving identity. Since Kilgore was interwined with Carden in the death of Norman, evidence that Kilgore killed Carden because "he knew too much" helps identify Kilgore as the perpetrator of the murder of Norman.

c) Kilgore makes two arguments in relation to the testimony of David Oldaker concerning the February 6, 1981 attempt on Norman's life. He first argues that evidence of a prior attempt on Norman's life by a stranger unconnected to Kilgore is irrelevant. However, Kilgore did not raise this objection to the testimony below, and as a result, will not be heard to raise it on appeal. *Sheffield v. State,* 235 Ga. 507 (2) (220 SE2d 265) (1975).

He next argues that the trial court erred in admitting over objection the hearsay testimony of David Oldaker that Benton told him that the man who wanted Norman killed was a crippled man named Tom, who sold pharmaceuticals and lived in a trailer in Soddy-Daisy, Tennessee. This testimony was the only evidence connecting Tom Carden to the February 1981 attempt. For the reasons which follow, we find that this hearsay testimony was inadmissible.

The testimony could only be admissible under the exception to the hearsay rule which provides that the out-of-court statements of one conspirator are admissible against all conspirators. OCGA § 24-3-5 (Code Ann. § 38-306). Therefore, this testimony was only admissible if Oldaker, Benton, and Kilgore were co-conspirators.

To have a conspiracy, there must be an agreement between two or more persons to commit a crime. LaFave & Scott, Handbook on Criminal Law, § 61 (1972); OCGA § 16-4-8 (Code Ann. § 26-3201); *Cunningham v. State,* 248 Ga. 835 (1) (286 SE2d 427) (1982). Here, there is no question that the evidence shows that Oldaker and Benton and Carden were co-conspirators in their attempt to kill Norman, and that Kilgore and Price and Carden were co-conspirators in the murder of Norman, *Orkin v. State,* 236 Ga. 176 (223 SE2d 61) (1976), but the question is whether Kilgore, who did not know of or communicate with Oldaker and Benton, and Oldaker and Benton, who likewise did not know of or communicate with Kilgore, can be

considered to have agreed to and become co-conspirators in the murder of Norman. We find that they cannot.

The type of agreement necessary to form a conspiracy is not the "meeting of the minds" necessary to form a contract and may be a "mere tacit understanding between two or more people that they will pursue a particular criminal objective." Kurtz, Criminal Offenses in Georgia, Conspiracy, pp. 54, 55 (1980). LaFave & Scott, Handbook on Criminal Law, supra, at p. 461. See *Cunningham v. State,* supra, p. 835. Also, "there need not be any written statement or even a speaking of words which expressly communicates agreement. It is possible for various persons to be parties to a single agreement (and thus one conspiracy) even though they do not know the identity of one another, and even though they are not all aware of the details of the plan of operation." LaFave & Scott, supra, p. 461. See, Blumenthal v. United States, 332 U. S. 539 (68 SC 248, 92 LE 154) (1947); cf. *Crosby v. State,* 232 Ga. 599 (207 SE2d 515) (1974).

However, limitations have been imposed upon the concept that persons who do not know each other can "agree" to commit a crime. Blumenthal v. United States, supra, pp. 558-559; Kotteakos v. United States, 328 U. S. 750, 768-769 (66 SC 1239, 90 LE 1557) (1946); LaFave & Scott, supra, pp. 480-482. An agreement, and thus one conspiracy, is more likely to be inferred in what have been termed "chain" conspiracies, "usually involving the distribution of narcotics or other contraband, in which there is successive communication or cooperation. . . ." LaFave & Scott, supra, p. 480. Because the parties should know by the large, ongoing nature of the conspiracy that the other members exist, and because the various "links" have a community of interest in that the success of one member's part is dependent upon the success of the whole enterprise, courts have treated links as co-conspirators despite a lack of communication or contact with one another. United States v. Bruno, 105 F2d 921, 922 (2nd Cir. 1939), rev'd on other grounds, 308 U. S. 287 (60 SC 198, 84 LE 257) (1939); United States v. Abushi, 682 F2d 1289 (6) (9th Cir. 1982); LaFave & Scott, supra, pp. 480-481; Kurtz, supra, pp. 57-58. In Bruno, supra, because of these considerations the court found but one conspiracy among many smugglers, middlemen, and retailers in a drug smuggling operation.

The "chain" conspiracy contrasts with the "wheel" conspiracy in which there is usually a "hub," or common source of the conspiracy, who deals individually with different persons, "spokes," who do not know each other. It is more difficult to infer an agreement among these spokes than among the links of a "chain" conspiracy because they are less likely to have a community of interest or reason to know of each other's existence since one spoke's success is usually

not dependent on the other spokes' success, but instead on his dealings with the hub. This is the type of conspiracy, if any, with which we deal in this case. Kotteakos v. United States, supra, is the classic case of a "wheel" conspiracy. There, Brown, the hub, agreed with various persons, the spokes, on an individual basis to fraudulently procure loans for them for a 5% commission. Because most of the spokes had no connection with and had not aided each other, the court found that there was no common purpose or interest among the spokes and, thus, that they were not co-conspirators. Kotteakos v. United States, supra, pp. 754-757, 768-769. However, LaFave & Scott, supra, pp. 481-482, notes that even if each spoke is only concerned with his one transaction with the hub, the spokes may be considered co-conspirators if the hub views his dealings with each spoke as part of a single large enterprise and if it can be inferred that the spokes know of the other spokes, such as where each spoke should be aware that the success of its plan with the hub depends upon the success of the hub's plan with other spokes. See, Note, Multiple Conspiracies, 57 Columbia L. Rev., 387, 388-89 (1957).

In the instant case, we conclude that Kilgore was not a co-conspirator of Benton and Oldaker. Here, there was no community of interests between Benton and Oldaker on the one hand and Kilgore on the other. The success of Benton's and Oldaker's attempt to kill Norman was not dependent in any way on Kilgore. Likewise, the success of Kilgore's attempt to kill Norman was not aided by Oldaker and Benton, especially considering that they did not assist in further efforts to kill Norman after February 6, 1981.

In addition, Benton and Oldaker, as one spoke, and Kilgore, as another or replacement spoke, had no knowledge of and no reason to know of each other such that an agreement can be inferred between them. There was no reason for Kilgore to know of the previous attempt on Norman's life, as his success was not dependent on it. Likewise, Oldaker and Benton had no reason to know of another spoke. It could be argued that Oldaker and Benton should have known that if they failed Carden would find another spoke, and that, therefore, they can be deemed to have "agreed" with this spoke. However, we find this reasoning to be too speculative a ground on which to infer such an agreement.

For the above reasons, we find that Kilgore and Oldaker and Benton were not co-conspirators. Consequently, it was error to admit the hearsay testimony of Oldaker. However, after examining the record, we conclude that this error was harmless. *Johnson v. State,* 238 Ga. 59, 61 (230 SE2d 869) (1976); *Blanchard v. State,* 247 Ga. 415 (2) (276 SE2d 593) (1981). First, other testimony covered the same evidence as that contained in the hearsay testimony. Specifically,

Chambers' testimony also linked Carden to the conspiracy to kill Norman. *Lee v. State,* 247 Ga. 411 (1) (276 SE2d 590) (1981). In addition, there was otherwise overwhelming evidence of guilt, *Owens v. State,* 248 Ga. 629, 631 (284 SE2d 408) (1981), particularly the evidence strongly linking Kilgore to the June 8, 1981 attempt on Norman's life, the testimony of Kilgore's phone conversations with Carden, the testimony concerning the pickups of large sums of money from Carden, the testimony about Kilgore's July 5, 1981 attempt to kill someone between Knoxville and Chattanooga, Kilgore's absence from Chambers' home the night of July 8, 1981, and Kilgore's admission of guilt to Chambers which was corroborated in all respects.

For these reasons, we hold the error was harmless.

4) a) In enumeration of error forty-six, Kilgore contends that the trial court erroneously refused after written request to charge the jury on the principle of corroboration of accomplice testimony. He contends that Constance Chambers and David Lyle Oldaker were accomplices. However, for the reasons stated in Division 1 (a), supra, Chambers was not an accomplice. We also find that under the authority cited in Division 1 (a), supra, Oldaker was not an accomplice to the murder of Norman. Oldaker's attempt to kill Norman failed, and the record shows that he made no further efforts either on his own or with Kilgore to kill Norman. Consequently, the requested charge was not warranted by the evidence, and the trial court did not err in refusing to give it. *Harper v. State,* 249 Ga. 46 (3) (287 SE2d 211) (1982); *Stevens v. State,* 247 Ga. 698 (9) (278 SE2d 398) (1981).

b) In six other enumerations of error, Kilgore contends that the trial court erred in failing to give certain charges and in giving other charges he contends were not warranted. We find these enumerations to be without merit. As to the failure to give certain charges, it was not error to fail to give them because some were not requested, *Curry v. State,* 230 Ga. 221, 222 (196 SE2d 443) (1973), and others, which were requested, were not warranted by the evidence, *Harper v. State,* supra. As to the charges given by the trial court which Kilgore contends were erroneous, we find that they were adjusted to the evidence and covered applicable principles of law.

5) In six related enumerations of error, Kilgore contends that the trial court erroneously failed to require the district attorney to provide exculpatory evidence in his files to the defense, erroneously failed to permit defense counsel to view the state's file, and erroneously failed to conduct an in-camera inspection of the state's entire file.

Prior to trial, Kilgore filed a general "Brady" motion, a specific

"Brady" motion for discovery of the statements of sixteen state's witnesses, and a motion to permit an inspection of the state's entire file.

Kilgore first argues that it was error for the trial court not to grant his motion to inspect the state's file because it had been the standing policy of the District Attorney for the Lookout Mountain Circuit to permit inspection of files in an effort to satisfy Brady requirements. Since there is " ' "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case," ' " *Harper v. State,* 249 Ga. 519, 528 (292 SE2d 389) (1982), the question is whether the general policy of the district attorney to allow inspection of his files overrides this rule and makes it obligatory to allow inspection in all cases. We decline to so hold and find that the opening of the state's file is merely an option available to the district attorney to satisfy his duties under Brady v. Maryland, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963). See *Reed v. State,* 249 Ga. 52, 53-57 (287 SE2d 205) (1982).

Unhappy with the material provided by the state in response to his discovery motions, Kilgore exercised his right to request an in-camera inspection. *Reed v. State,* supra, p. 55; *Tribble v. State,* 248 Ga. 274 (1) (280 SE2d 352) (1981). Kilgore was particularly concerned with an inspection of the statements of Constance Chambers. Although Kilgore alleges the trial court failed to conduct a complete in-camera inspection, the record indicates that the court did so.

Kilgore specifically complains that the state provided him with only a summary of a statement given by David Oldaker and with only a summary of inconsistencies contained in Chambers' statements. Assuming without deciding that the statements of Oldaker and Chambers contained true "Brady" material, the record shows that during trial Kilgore was provided, pursuant to the trial court's order, with verbatim, transcribed copies of the applicable statements of Oldaker and Chambers. Furthermore, on appeal the appellant has the burden of showing he was denied material exculpatory information such that he was denied a fair trial. *Wallin v. State,* 248 Ga. 29 (6) (279 SE2d 687) (1981); *Potts v. State,* 241 Ga. 67, 74 (243 SE2d 510) (1978). Here, Kilgore has clearly not met this burden. He was ultimately provided with copies of the full statements he wanted; he did not ask for a continuance at trial; and he has not shown how the delay in providing these statements denied him a fair trial. *Castell v. State,* 250 Ga. 776 (2) (b) (301 SE2d 234) (1983).

6) In another enumeration, Kilgore complains of comments the trial court made to the jury after it had granted the state's motion to permit a jury view of the victim's automobile. After granting the

motion, the trial court announced: "Members of the jury, counsel for the State has made a motion that you be permitted to view this vehicle . . . and the Court granted that motion." Kilgore argues that this instruction was prejudicial, first, because it inferred that he had objected to the view thereby defeating the purpose for making the motion outside the presence of the jury, and second, because it amounted to an impermissible comment on the evidence. Kilgore also complains that the trial court failed to instruct the jury that the view was not to be considered as evidence.

We find these contentions to be without merit. First, we find that the remarks by the trial court were neutral in content and were made in an attempt to explain his ruling, and that as such they did not amount to a comment on the evidence and did not improperly infer that the defendant objected to the view. *Johnson v. State,* 246 Ga. 126 (5) (269 SE2d 18) (1980). The trial court also instructed the jury, both during the course of the trial and in its charge, that any remarks made by it during the trial were not a comment upon the case, but were only made so that the case could be fairly presented according to the law. Such instructions are sufficient, without any further showing by the appellant, to cure any possible prejudice from the above remarks. Next, the trial court did not err in not instructing the jury that the view was not to be considered as evidence, since in fact such a view is evidentiary in nature. *McDaniel v. State,* 248 Ga. 494 (2) (283 SE2d 862) (1981); *Jordan v. State,* 247 Ga. 328 (9) (276 SE2d 224) (1981).

7) In enumeration of error forty-four, Kilgore contends that it was prejudicial error for the trial court to allow over objection the following colloquy between the District Attorney and Sheriff Steele: "Q. Sheriff Steele, I'll ask you if you know if the name of Bob Price has been mentioned prominently on the news recently? A. Yes, sir. Q. When was that? A. Last night." Kilgore argues that this questioning was improper considering that the jury had been sequestered throughout the trial to prevent their hearing any accounts of the trial through the news media.

The state argues that the purpose of this questioning was to show that Bob Price, Kilgore's accomplice and co-conspirator, who had been living at Norman's widow's house, had heard his own name in the media and had probably fled from her house, just as he had fled when Kilgore was arrested. The relevancy of this questioning is marginal, especially considering that the letter discovered at Brenda Norman's house indicates Price was leaving because he had recently discovered the police were on his trail. However, the prejudice to the defendant is also marginal. The questions and answers were neutral and did not in any way disclose the content of the media coverage.

Because the colloquy lacked prejudicial impact, we find no

prejudicial error in admitting the testimony. McCormick on Evidence, §§ 184, 185 (2d Ed. 1972); *Owens v. State,* 248 Ga., supra, at 630.

8) We have examined the remaining enumerations of error and find that they are either without merit or have been abandoned by failure to support with argument or citation of authority. *Myron v. State,* 248 Ga. 120 (10) (281 SE2d 600) (1981).

Finding no reversible error, we affirm the conviction.

*Judgment affirmed. All the Justices concur.*

DECIDED JUNE 28, 1983 —
REHEARING DENIED JULY 22, 1983.

*Auman & Meaney, James A. Meaney III,* for appellant.

*David L. Lomenick, Jr., District Attorney, Herbert E. Franklin, Assistant District Attorney, Michael J. Bowers, Attorney General, Janice G. Hildenbrand, Staff Assistant Attorney General,* for appellee.