S13A0967. GRIFFIN v. THE STATE.
(751 SE2d 773)

HUNSTEIN, Justice.

Tommy Tyrone Griffin was convicted of felony murder and conspiracy to commit trafficking in cocaine in connection with a fatal shooting in a Gwinnett County apartment in April 2010.[1] Griffin appeals from the denial of his motion for new trial, challenging the sufficiency of the evidence and the trial court's instructions to the jury. Our review of the record reveals that the State failed to adduce any evidence on an essential element of the drug conspiracy charge and therefore that his conviction for conspiracy to commit trafficking in cocaine must be reversed. Because the felony murder conviction

---

[1] In June 2011, Griffin was indicted by a Gwinnett County grand jury on two counts of felony murder, attempted armed robbery, conspiracy to commit trafficking in cocaine, and firearm possession during the commission of a felony. Griffin was tried before a jury in July 2011. At the close of the State's evidence, the trial court directed verdicts of acquittal on the attempted armed robbery charge and the felony murder count predicated thereon. The jury then acquitted Griffin on the firearm possession charge but convicted him of conspiracy to traffic in cocaine and felony murder predicated on the drug conspiracy. Griffin was sentenced to life imprisonment for the felony murder, and the drug conspiracy conviction was merged. On July 18, 2011, Griffin filed a motion for new trial, which he amended on August 20, 2012 following the appointment of new counsel. The motion was denied on November 28, 2012, and Griffin filed a notice of appeal on December 18, 2012. The appeal was docketed to the April 2013 term of this Court and was thereafter submitted for decision on the briefs.

was predicated on the drug conspiracy offense, this conviction must, in turn, be reversed as well.

Viewed in the light most favorable to the jury's verdicts, the evidence adduced at trial established as follows. On April 8, 2010, Griffin and two other men drove to a Gwinnett County apartment with $4,000 for the purpose of purchasing drugs. When the men entered the apartment, a shootout erupted, involving at least two different guns. Griffin was shot in the abdomen, and two of the apartment's occupants were shot, one of whom died from his wounds. Everyone present at the shootout fled.

In the apartment, investigators found drug paraphernalia including digital scales, plastic wrap, baggies, and money marking pens used to detect counterfeit money. Further searching uncovered a large package of cocaine — later quantified at 248.56 grams — hidden under the furnace where floorboards had been cut. Based on the sparsely furnished nature of the apartment and the presence of drugs and their accoutrements, an expert witness opined that the house was a "stash house," used for storing and distributing illegal drugs.

In an interview with police, Griffin claimed that he had gone to the apartment with two other men, one of whom he knew as "Tru," to purchase marijuana. He told police that when he entered the apartment the men there asked for his money, and then another man emerged from a back room and opened fire. He denied being in possession of a gun at the time, and he told police he believed he had been set up to be robbed. Forensic testing indicated that marijuana had not been present in the apartment.

In evaluating the sufficiency of the evidence, our task is to ascertain whether, viewing the evidence in the light most favorable to the jury's verdicts, there was evidence establishing each essential element of each crime of which the defendant was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). Here, Griffin was convicted of conspiracy to commit trafficking in cocaine, as well as felony murder predicated on the drug trafficking conspiracy. Specifically, the indictment charged that Griffin:

> did then and there unlawfully, together with Benjamin Catalan-Gonzalez, Federico Andres Espinal, Juan Silverio-Gonzalez, Pedro Ortiz-Gonzalez, and other persons, conspire to commit a violation of OCGA § 16-13-31, the offense of Violation of the Georgia Controlled Substances Act: Trafficking in Cocaine, and one or more of the conspirators did perform one or more of the following overt acts, to wit: (a) the said accused did travel to [the stash house] for the purpose

of conducting a drug transaction, (b) Federico Andres Espinal did bring money marking pens used for the identification of counterfeit currency to [the stash house] for the purpose of conducting a drug transaction; and (c) Pedro Ortiz-Gonzalez, Juan Silverio-Gonzalez, and Benjamin Catala[n]-Gonzalez did possess two-hundred (200) grams or more of a mixture containing at least ten percent (10%) cocaine . . . .

See OCGA § 16-13-31 (a) (1) (offense of trafficking in cocaine committed when one sells, manufactures, delivers, imports, or "is in possession of" 28 grams or more of cocaine or any mixture with a purity of 10% or more of cocaine).

"A person commits the offense of conspiracy to commit a crime when he together with one or more persons conspires to commit any crime and any one or more of such persons does any overt act to effect the object of the conspiracy." OCGA § 16-4-8. In order for a conspiracy to exist, "there must be an agreement between two or more persons to commit a crime." *Kilgore v. State*, 251 Ga. 291, 298 (3) (c) (305 SE2d 82) (1983). Such agreement need not be express, nor does it require a "meeting of the minds" to the same degree necessary to form a contract; all that is required is a tacit mutual understanding between persons to pursue a common criminal objective. *Duffy v. State*, 262 Ga. 249 (1) (416 SE2d 734) (1992); *Kilgore*, 251 Ga. at 299. In the context of narcotics trafficking, courts have sometimes inferred such a tacit agreement even where participants had no direct contact with one another, where there was evidence that "each defendant knew or had reason to know the scope of the criminal enterprise, and had reason to believe that their own benefits derived from the operation were dependent upon the success of the entire venture. [Cit.]" (Punctuation and emphasis omitted.) *United States v. Abushi*, 682 F2d 1289, 1293 (9th Cir. 1982). Accord *United States v. Matthews*, 168 F3d 1234, 1245 (11th Cir. 1999); *Kilgore*, 251 Ga. at 299.

At the same time, however,

[Georgia's] appellate courts have consistently held . . . that "the mere agreement of one person to buy contraband which another agrees to sell does not establish that the two acted in concert so as to support a finding of a conspiracy." [Cit.] This is because in an illegal drug transaction the purchaser and the seller are not acting together to commit the same crime and there is no joint design or purpose.

*Darville v. State*, 289 Ga. 698, 700 (2) (715 SE2d 110) (2011). Thus, a

simple buy-sell transaction, without more, does not support a conspiracy conviction under Georgia law. Id.; *Pruitt v. State*, 264 Ga. App. 44 (2) (589 SE2d 864) (2003) (reversing drug conspiracy conviction where evidence showed nothing more than that defendant purchased drugs periodically from dealer). Even where there is evidence that the buyer purchased drugs in a quantity that exceeds the amount one would likely want for personal use, such evidence is insufficient to sustain a conviction for conspiracy between supplier and buyer, absent evidence that the supplier had some stake in the buyer's resales. Id. Such a stake may be shown where, for example, the supplier "fronts" the drugs to the buyer for the buyer to resell, with the proceeds used to pay for drugs. See, e.g., *Aguilera v. State*, 320 Ga. App. 707 (1) (740 SE2d 644) (2013).

Here, the record contains no evidence of any agreement between Griffin and the men operating the stash house, beyond a possible buy-sell agreement. In his statement to police, Griffin denied any prior acquaintance with the stash house men, and the State offered no evidence suggesting otherwise. In fact, the lead detective, when questioned on cross-examination, admitted that investigators had no evidence that Griffin even knew there was cocaine at the stash house when he arrived there.

The dissent contends that the evidence is sufficient to support the conclusion that Griffin "conspired with a friend and others to possess more than 28 grams of cocaine." The only evidence regarding this "friend" — "Tru," whose actual identity has never been discovered — was from Griffin's statements to police in which he claimed that he accompanied Tru to the stash house to purchase marijuana. There was no evidence that Tru had any agreement or relationship with the stash house men. Though the fact of Tru's presence with Griffin at the stash house might conceivably be viewed as evidence of some agreement between him and Griffin, the conspiratorial agreement actually alleged here was one involving the stash house men, Griffin, *and* others. "[T]he state must prove all material allegations in an indictment which describe the offense or the particular manner in which the offense was committed." *Smith v. State*, 202 Ga. App. 664, 666 (415 SE2d 481) (1992); see also *State v. Grube*, 293 Ga. 257, 260 (2) (744 SE2d 1) (2013) ("to comport with constitutional due process an indictment charging a defendant with a criminal offense must . . . contain the essential elements of the crimes and *apprise a defendant of what he must be prepared to meet at trial*" (emphasis supplied)). Consistent with the language of the indictment, the prosecution's presentation of the case centered on the allegation of a conspiracy involving the men at the stash house. The absence of proof

of any agreement between Griffin or his compatriots with the stash house men is thus fatal to Griffin's conspiracy conviction. See *Smith*, 202 Ga. App. at 665 (reversing conviction on conspiracy to sell non-controlled substance where defendant was indicted for conspiracy to sell cocaine).

Accordingly, Griffin's conviction for conspiracy to commit trafficking in cocaine must be reversed. Griffin's felony murder conviction, predicated on the drug trafficking conspiracy offense, must likewise be reversed.

*Judgment reversed. All the Justices concur, except Hines, P. J., and Melton, J., who dissent.*

MELTON, Justice, dissenting.

The majority imposes an extremely narrow buy-sell theory as the exclusive means of proving guilt on this drug transaction case, misinterprets the broad indictment using this unduly limited theory, and, as a result, unnecessarily and improperly overturns a felony murder and a conspiracy conviction based on *possession* of cocaine. I respectfully dissent.

1. In the light most favorable to the verdict, the record shows that, on April 8, 2010, Tommy Tyrone Griffin, accompanied by a friend, traveled to unit 1806 at the Sinclair Apartments in order to acquire drugs, carrying $4,000 with him. Testimony showed that, at the time, cocaine was selling for approximately $30 per gram. Apparently, the drug transaction went wrong, and a shootout occurred. As a result, Griffin suffered from a gunshot wound to the abdomen, Federico Espinal was shot in the foot, and Pedro Ortiz-Gonzalez received a gunshot wound to the face which, ultimately, killed him. Shortly after the shootout, all participants in the drug transaction fled the scene.

When police arrived at the apartment, they discovered human blood, teeth, and tissue, as well as evidence that ten .40 caliber shots and twenty-five .223 caliber rifle shots had been fired in the apartment in a crossfire exchange. Further searching uncovered a large package of cocaine hidden under the furnace where floorboards had been cut. In addition, the kitchen contained drug paraphernalia including digital scales, plastic wrap, and baggies. Based on the sparsely-furnished nature of the apartment and the presence of drugs and accoutrements, an expert determined that the apartment was a "stash house" for drug sales and distribution.

In an interview with police, Griffin admitted that he went to the apartment with someone named "Tru" to purchase marijuana. Griffin stated that he knew Tru from work, that Tru knew a "Mexican" who could sell him marijuana, and that Tru agreed to take him to this

dealer. Griffin said, after getting the marijuana, someone came out of the back room shooting. Forensic testing indicated, however, that marijuana had not been present in the apartment.

This evidence was sufficient to enable the jurors to determine that Griffin was guilty of the crimes for which he was convicted beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

More specifically, with regard to Griffin's conviction for conspiracy to traffic in cocaine by possessing more than 28 grams,[2] there was evidence upon which jurors could conclude that Griffin had conspired with others in the apartment to possess the cocaine[3] that was ultimately found there by police. Contrary to Griffin's argument, his statement that he was going to the apartment to buy marijuana, not cocaine, does not change this result, as the jury was free to believe that Griffin went to the apartment to possess the drugs that were actually present there and to disbelieve his contention that he was only seeking marijuana rather than cocaine. This conclusion was supported by the fact that the apartment contained more than 28 grams of cocaine and a plethora of drug paraphernalia, the fact that Griffin was carrying enough money to acquire far more than 28 grams of cocaine, the fact that Espinal was in possession of money marking pens when he was discovered in the woods after the shooting, the fact that no marijuana was found in the apartment, and Griffin's own admission that he was going to what was determined to be a stash house with a compatriot for the purpose of obtaining illegal drugs. This admission alone indicates that Griffin was conspiring with another person to obtain drugs, and the other facts mentioned allowed the jury to determine the type and amount of drugs being sought out. This evidence was sufficient to support the verdict. *Jackson*, supra.

Despite Griffin's statement that he was seeking out drugs with a friend, the majority recharacterizes this case as one in which there

---

[2] The indictment states that Griffin "did then and there unlawfully, together with Benjamin Catalan-Gonzalez, Federico Andres Espinal, Juan Silverio-Gonzalez, Pedro Ortiz-Gonzalez, *and other persons*, conspire" to possess a trafficking amount of cocaine. (Emphasis supplied.) The indictment then goes on to state that

> one or more of the conspirators did perform one or more of the following overt acts, to wit: (a) [Griffin] did travel to the [apartment in question] for the purpose of conducting a drug transaction, (b) Federico Andres Espinal did bring money marking pens . . . , and (c) Pedro Ortiz Gonzalez, Juan Silverio-Gonzalez, and Benjamin Catala[n]-Gonzalez did possess two-hundred (200) grams or more of a mixture containing at least ten percent (10%) cocaine.

[3] OCGA § 16-13-31 (a) (1) provides: "Any person who . . . is in possession of 28 grams or more of cocaine or of any mixture with a purity of 10 percent or more of cocaine, as described in Schedule II, in violation of this article commits the felony offense of trafficking in cocaine."

was merely a buy-sell transaction between Griffin and whoever was operating the stash house. The majority determines, based on its own assumptions regarding the simple buy-sell scenario, that the evidence is insufficient in the absence of a demonstrated joint objective or common design between Griffin and the stash house operators. See *Darville v. State*, 289 Ga. 698, 700 (2) (715 SE2d 110) (2011). The problem with the majority's analysis, however, is that it reweighs facts to support its conclusions, namely that there was *only* evidence of a simple buy-sell transaction, rather than viewing the facts in the light most favorable to the verdict which would support a jury conclusion that Griffin conspired *with a friend*[4] and others to possess more than 28 grams of cocaine.

The majority improperly imposes its limited buy-sell scenario onto the wording of the indictment, arguing that the State was required to prove that the "stash house men," Griffin, and others were all involved in the conspiracy from the moment of its inception. The majority then concludes that proof of any such conspiracy is impossible because there was no evidence that Tru had any agreement or relationship with the "stash house men." The majority, however, overlooks the entirety of the indictment and is factually incorrect. With regard to the indictment, it specifically alleges that one or more of the conspirators did one or more of three listed overt acts, the first of which was traveling to the apartment in question to conduct a drug transaction. Therefore, the majority's contention that Griffin would not have been on appropriate notice that he would have to defend against a type of conspiracy and conspiratorial act explicitly stated in the indictment is untenable. To support its reading of the indictment, the majority relies on its view of the prosecution's "presentation of the case" as being "centered on the allegation of a conspiracy involving the men at the stash house." This sets dangerous precedent contrary to the most fundamental principles of a review of sufficiency of the evidence. The prosecution's "presentation of the case," which the majority leaves undefined, has no bearing on whether the evidence presented at trial was sufficient to enable the jury to find Griffin guilty of the crimes for which he was indicted. Furthermore, the majority's characterization of the evidence is simply wrong. In his second interview with police, Griffin, himself, stated that he believed that Tru and the "stash house men" might have been working

---

[4] "A person commits the offense of conspiracy to commit a crime when he together with one or more persons conspires to commit any crime and any one or more of such persons does any overt act to effect the object of the conspiracy." OCGA § 16-4-8.

together. Griffin even argued at one point that they had set him up. Again, the majority's arguments are simply not supported by the record.

With regard to Griffin's felony murder conviction, the jury was authorized to conclude that Ortiz-Gonzalez's death was caused by Griffin's participation in the conspiracy to possess cocaine. Despite Griffin's argument to the contrary,

> the requirement that the underlying offense must be fore- seeably dangerous has been met. In determining whether a felony is inherently dangerous to human life, this Court does not consider the elements of the felony in the abstract, but instead considers the circumstances under which the felony was committed. Here, [there was a drug transaction, and s]ome of the parties to the transaction arrived armed, which is not unusual in the drug trade. . . . Under the circum- stances, the risk of death from this particular felony was reasonably foreseeable.

(Citations and punctuation omitted.) *Davis v. State*, 290 Ga. 757, 760-761 (4) (725 SE2d 280) (2012).

2. Griffin further contends that the trial court erred by instruct- ing the jury as to the entirety of the statutory definition of trafficking in cocaine, rather than limiting it to possession only. The trial court charged the jury as follows: "A person who knowingly sells, delivers, or brings into this state or who is knowingly in possession of 28 grams or more of cocaine or of any mixture with a purity of 10 percent or more cocaine commits the offense of trafficking in cocaine."

> While instructing the jury that a crime can be committed in a manner different from that charged in the indictment can constitute reversible error, "a reversal is not mandated where, as here, the charge as a whole limits the jury's consideration to the specific manner of committing the crime alleged in the indictment." *Walls v. State*, 283 Ga. App. 560, 562 (3) (642 SE2d 195) (2007) (citation omitted). Here, the trial court read the indictment to the jury, instructed the jury that the state had the burden of proving every material allegation in the indictment beyond a reasonable doubt and sent the indictment out with the jury during its deliberations.

(Footnote omitted.) *Machado v. State*, 300 Ga. App. 459, 462-463 (5) (685 SE2d 428) (2009). As a result, the trial court's instructions cured any alleged problem with the charge. Id.

I am authorized to state that Presiding Justice Hines joins in this dissent.

DECIDED NOVEMBER 25, 2013 —
RECONSIDERATION DENIED DECEMBER 11, 2013.
Murder. Gwinnett Superior Court. Before Judge W. Davis.
*Clark & Towne, Jessica R. Towne,* for appellant.
*Daniel J. Porter, District Attorney, Robby A. King, Assistant District Attorney, Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, David A. Bikoff, Assistant Attorney General,* for appellee.