**SECOND DIVISION**
**RICKMAN, C. J.,**
**MILLER, P. J., and PIPKIN, J.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**March 14, 2023**

# In the Court of Appeals of Georgia

A22A1612. QUANTANILLA-SOLIS v. THE STATE.

PIPKIN, Judge.

A Fulton County jury found Appellant Juan Carlos Quantanilla-Solis guilty of statutory rape, two counts of child molestation, and two counts of sexual battery. Following the denial of his motion for new trial, Appellant appeals, arguing that the evidence was insufficient to sustain his conviction for statutory rape, that the trial court committed reversible error, that trial counsel was constitutionally ineffective, and that the trial court should have merged several counts for sentencing. Though we agree that Appellant was erroneously sentenced, we otherwise affirm.

1. We turn first to Appellant's claim that there was insufficient corroborating evidence to support his conviction for statutory rape. Viewed in the light most

favorable to the verdict,[1] the evidence presented at trial with respect to this count showed as follows. Appellant met the victim, G. M., through her older brothers. In October 2008, around the time of G. M.'s twelfth birthday, Appellant, who was 22 years old, began giving presents to G. M. and inquiring whether she had a boyfriend. Appellant gave G. M. multiple gifts over the next several months. On February 13, 2009,[2] G. M. spent the night with her best friend. While there, Appellant sent a text message to G. M., telling her that he wanted to hang out with her. G. M. then made a phone call, and, around midnight, G. M. informed her friend that her brother was coming to get her. G. M. left through a window, explaining that she did not want to wake her friend's family members. About thirty minutes later, G. M. called her friend and admitted that she had in fact left with Appellant; G. M.'s friend testified that G. M. referred to Appellant as her boyfriend and often professed her love for him.

As to that night, G. M. testified that Appellant took her to his apartment, where they put pillows and a blanket on the living room floor. Appellant then removed

---

[1] *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

[2] The crimes occurred in February 2009, and Appellant was indicted in June 2009. Appellant failed to appear before the trial court in September 2010, and a bench warrant was issued for his arrest. Appellant was arrested in July 2015, and his trial occurred in April 2018.

G. M.'s clothes and had sexual intercourse with her. Appellant returned G. M. to her friend's home sometime in the early morning hours. When G. M. arrived at her friend's house, her pants were stained with blood; G. M. attributed the staining to menstruation, but her friend testified that she did not believe G. M. "because she mentioned she was on her period a couple of days back." G. M.'s friend testified that G. M. confessed later that day that she had sex with Appellant the night before, with the friend noting that "it was [G. M.'s] first time."

On February 26, 2009, following a second instance of sexual contact between G. M. and Appellant,[3] G. M. made an outcry to her uncle, who contacted the police. During the investigation, G. M.'s blood-stained pants were taken into evidence; G. M.'s sister testified that, when the police located the blood-stained pants, she recognized them as "leggings that [G. M.] had been wearing the day that she had been with [Appellant]." G. M. participated in a forensic interview, which was video-recorded and played for the jury at trial. During the interview, G. M. stated that she loved Appellant and that she believed he loved her; she also indicated that she was a virgin prior to her sexual contact with Appellant. G. M. underwent a medical

---

[3] Appellant was charged with an additional count of statutory rape in connection with this second encounter; the jury acquitted him of that charge.

examination about two months after the crimes occurred, and at trial, her treating physician testified that some women report bleeding during or after their first time having sexual intercourse.

Appellant was interviewed at his apartment by police in connection with the investigation of G. M.'s outcry; the interview was audio-recorded and played for the jury at trial. During the interview, Appellant admitted that G. M. had been to his apartment on several occasions, including one instance when he picked her up from a friend's house in the middle of the night. Appellant indicated that he and G. M. stayed on the living room floor that night; the interviewing officer testified that, based on Appellant's "mannerisms and gestures" during the interview, which were not captured on the audio recording, he inferred that Appellant and G. M. had "snuggled."

On appeal, Appellant complains that the State failed to adduce any evidence to corroborate the victim's testimony as to the statutory rape conviction. Appellant notes the absence of forensic evidence, discounts the corroborative value of G. M.'s blood-stained paints, and asserts that no other evidence at trial independently corroborates the crime. Appellant not only takes too narrow a view of the evidence against him but also overstates the extent of independent evidence necessary to corroborate an accusation of statutory rape.

"A person commits the offense of statutory rape when he . . . engages in sexual intercourse with any person under the age of 16 years and not his . . . spouse, provided that no conviction shall be had for this offense on the unsupported testimony of the victim." OCGA § 16-6-3 (a). Put another way, the State must present some evidence to corroborate the victim's testimony that the defendant committed statutory rape. Corroborating evidence "is evidence from an independent source that supports the conclusion that the defendant committed the statutory rape of the victim" and must "provid[e] independent details that support the victim's accusations." *Atkins v. State*, 304 Ga. 240, 243-244 (2) (818 SE2d 567) (2018). But "[c]orroborating evidence may be slight. The quantum of corroboration needed in a statutory rape case is not that which is in itself sufficient to convict the accused . . . . Slight circumstances may be sufficient corroboration, and ultimately the question of corroboration is one for the jury." (Citation and punctuation omitted.) Id. at 242 (2). See also *Timmons v. State*, 182 Ga. App. 556, 557 (356 SE2d 523) (1987) ("[I]t is not necessary that the child be corroborated as to every essential element of the crime, or that it establish the defendant's guilt, but only that the corroborating evidence *tend* to establish his guilt and be of such a character and quality as tends to prove the guilt of the accused by

connecting him with the crime.") (citation and punctuation omitted; emphasis in original).

Here, the State presented evidence corroborating G. M.'s accusation in several respects. The testimony of G. M.'s friend and Appellant's own admissions corroborated G. M.'s whereabouts on the night of the crime. Namely, this testimony supported G. M.'s statements that Appellant picked her up in the middle of the night from her friend's home, that they went to his apartment, and that they situated themselves on the living room floor. Evidence was also presented in the form of G. M.'s blood-stained pants to establish that she was suffering vaginal bleeding when she returned from Appellant's apartment, and the State introduced circumstantial evidence from which a jury could reasonably infer that the vaginal bleeding occurred

as a result of sexual intercourse.[4] Specifically, G. M.'s friend testified that she did not believe the stains were caused by menstrual blood and offered a basis for that belief. In addition, G. M.'s treating physician testified that some women bleed after having sexual intercourse for the first time, and there was evidence that 12-year-old G. M. was a virgin at the time of the crimes. Viewed in the light most favorable to the jury's verdict,[5] this corroboration was more than sufficient. See *Sanchez v. State*, 316 Ga. App. 40, 41 (1) (728 SE2d 718) (2012) (victim's testimony corroborated by medical evidence, defendant's opportunity to commit the crimes as alleged, and defendant's own statements); *Tucker v. State*, 173 Ga. App. 742, 742-743 (1) (327 SE2d 852)

---

[4] Appellant faults the State for failing to produce evidence conclusively ruling out menstruation as the source of blood and argues that, absent such evidence, the pants cannot corroborate G. M.'s testimony. In support of this claim, Appellant points to our decision in *McClendon v. State*, 187 Ga. App. 666, 667 (371 SE2d 139) (1988), which concluded that an accusation of statutory rape was sufficiently corroborated by, among other things, physical evidence establishing that the 13-year-old victim's vaginal bleeding was not caused by menstruation. But *McClendon* does not hold that the State may not rely on *circumstantial* evidence to establish the source of vaginal bleeding. Indeed, we noted in *McLendon* that "other circumstantial corroborating evidence" supported the defendant's conviction. Id. Whether the circumstantial evidence presented here was sufficient to corroborate G. M.'s testimony was for the jury to decide.

[5] We note that the State emphasized the corroboration requirement in closing argument. The record reflects that the jury was keenly attuned to its duty to determine whether the statutory rape claims were corroborated and, during deliberations, requested "the legal definition of slight corroboration."

7

(1985) (corroborating evidence included victim's cousin's testimony establishing defendant's presence in the bedroom where the crime occurred and the presence of blood on the 12-year-old victim's underwear); *Hill v. State*, 159 Ga. App. 489, 490-491 (1) (283 SE2d 703) (1981) (victim's accusation corroborated by testimony that victim slept with appellant on several occasions while her mother slept elsewhere in the home). Cf. *Atkins*, 304 Ga. at 245 (2) ("mere fact" that victim "occasionally visited [defendant's] home, standing alone, does not connect [defendant] with the statutory rape of [the victim] as alleged").

2. Appellant next challenges a comment made by the trial court to prospective jurors. During individual voir dire, Juror No. 9 stated that her childhood best friend was molested by a family member. The State asked whether "anything about what happened to [the juror's friend] would . . . in any way inhibit [her] ability to be fair and impartial in this case." Juror No. 9 responded no, but then explained that, while she was "fact-based," once the trial began, she didn't "know how [she] would feel about the people on the stand, their demeanor, or their emotional state when they're recounting the events." Upon further questioning from the State, Juror No. 9 affirmed that she was willing to listen to the evidence with an open mind and to follow and apply the law as instructed by the trial court; when asked whether she had "made up

8

[her] decision about the guilt or innocence of [Appellant]," Juror No. 9 responded, "Not at this time." The State concluded its questioning of Juror No. 9, but before Appellant commenced his examination of the juror, the trial court remarked as follows:

> If it'll assist jurors, you're required to be fair and impartial now at the beginning. Once you start hearing the evidence, it swings back and forth. You begin to hear it and your mind begins to move. It's required that you be fair and impartial at the beginning, remain fair, but your partiality changes. It may go back and forth as you hear the evidence. And you're required not to make a final decision until all of the evidence is in and the case has been submitted to you.

Appellant contends that the trial court's statement was erroneous because, as he understands the remark, it is inconsistent with his constitutional right to an impartial jury, it "told prospective jurors that reception of evidence can change their fairness," and it allowed the jury "to foreclose its fair consideration of reasonable doubt." Appellant acknowledges that he failed to contemporaneously object, but, pointing to OCGA § 17-8-58 (b), he characterizes the trial court's remark as a "preliminary [jury] instruction" and asserts that we may review his claim for plain error. Assuming that plain error review is available,[6] Appellant cannot demonstrate that the trial court's

_____

[6] While OCGA § 17-8-58 (b) permits plain error review of a "jury charge . . . which affects substantial rights of the parties," Appellant cites no authority to support

9

remark had any effect on the outcome of the proceedings. See *State v. Kelly*, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011) (to establish plain error, defendant must show, among other things, that the asserted error "likely affected the outcome of the trial court proceedings").

As an initial matter, while the remark was perhaps inartfully phrased, considered as a whole, its essence was a correct statement of the law. The trial court emphasized the long-standing principles that a juror's opinion about any issue in the case must be grounded solely in evidence presented at trial and that no final determination may be reached until all the evidence has been presented and the case submitted to the jury. Indeed, at the heart of the trial court's statement is a tacit recognition that an impartial juror is one whose "opinion is not fixed and definite," who is "able to set aside any inclination of bias," and who will "decide the case based solely upon the evidence at trial." *Akhimie v. State*, 297 Ga. 801, 806 (2) (777 SE2d 683) (2015).

Though Appellant takes issue with the trial court's statement that "partiality changes" and "may go back and forth as you hear the evidence," Appellant points to no authority to support the notion that a juror, *upon hearing evidence presented during*

the assertion that the trial court's off-the-cuff remark to prospective jurors during voir dire amounts to a jury charge within the meaning of the statute. Nevertheless, we need not decide that issue here because it is clear that there was no harm.

10

*the trial*, must refrain from forming preliminary, unfixed opinions about what that evidence might ultimately prove. And in fact, we have rejected claims raising similar arguments to challenge jurors' impartiality. See *Nelson v. State*, 269 Ga. App. 103, 105 (1) (603 SE2d 691) (2004) (where prospective juror stated during voir dire "that her opinion would begin forming as she processed the evidence," no error in failing to remove her for cause because "there was no indication that the juror was so biased that she could not render an impartial verdict based on the evidence"); *Doss v. State*, 264 Ga. App. 205, 213 (4) (f) (590 SE2d 208) (2003) ("The life experiences of any juror may trigger a response to evidence presented during a trial. We ask jurors to be impartial at the beginning of a trial, not at the end after hearing the evidence.").

In addition, the trial court posed the statutory qualifying questions to the venire, see OCGA § 15-12-164 (a), and Appellant does not argue that the trial court failed to remove any prospective juror for cause. Moreover, the jury was charged on the presumption of innocence, the State's burden of proof, reasonable doubt, and the duty to decide the case solely on the evidence presented at trial[7]; the trial court expressly charged the jury that it was "bound by these instructions." The jurors were further

_____

[7] The trial court charged the jury no fewer than six times regarding its duty to decide the case solely upon the evidence at trial. Appellant also highlighted that duty during his closing argument.

charged "not to show favor or sympathy to one party or the other," that they were duty-bound "to consider the facts objectively without favor, affection, or sympathy," and that they "should start [their] deliberations with an open mind" and should "not hesitate to change an opinion if . . . convinced that it is wrong." Under these circumstances, Appellant has not shown that the trial court's remark likely affected the outcome of the proceedings.

3. Appellant contends that his trial counsel was ineffective for failing to object to the trial court's remark detailed in Division 2. To establish ineffective assistance, a defendant must show that his trial counsel's performance was professionally deficient and that, but for such deficient performance, there is a reasonable probability that the result of the trial would have been different. See *Strickland v. Washington*, 466 U. S., 668, 695 (III) (B) (104 SCt 2052, 80 LE2d 674) (1984). This Appellant cannot do. As discussed in Division 2, there was no plain error because Appellant cannot demonstrate that counsel's failure to object likely affected the verdict, and "[c]oextensive with that determination, he cannot demonstrate prejudice in regard to this claim." *Mohamed v. State*, 307 Ga. 89, 94 (3) (b) (834 SE2d 762) (2019). See also *Hampton v. State*, 302 Ga. 166, 168-169 (2) (805 SE2d 902) (2017) (The Georgia Supreme Court "has

12

equated the prejudice step of the plain error standard with the prejudice prong for an ineffective assistance of counsel claim.").

4. In his fourth enumeration of error, Appellant contends that the trial court erred by disallowing several voir dire questions proposed by Appellant. This claim presents no cause for reversal.

Appellant proposed the following voir dire questions:

(1) Over the past couple of years, major political figures including [former President Donald Trump] have made disparaging remarks about immigrants from Mexico, Central America, and other nations. They have been called rapists and murderers. The countries they come from have been called "shitholes." They have been called "the worst people" of the countries they come from. Does anyone here share any of those sentiments?

(2) Does any[one] believe that [former President Trump] or others are on to something when they make these kinds of comments?

(3) Does anyone have any negative feelings about [Appellant] on the grounds that he shouldn't be in this country anyway?

(4) Does anyone feel that Latino immigrants are "stealing" American[s'] jobs[?]

13

(5) Does anyone believe that immigrants are more likely to commit crimes than U.S. citizens?

(6) Does anyone believe that Latino immigrants are more likely to have sex with young women under the age of consent because you believe it's part of their culture?

The State conceded the relevance of prospective jurors' bias toward Appellant as an immigrant from Latin America[8] but objected to the questions on the grounds that they were overly specific, injected irrelevant issues into the voir dire process, and, in some respects, asked the venire to prejudge the case. The trial court sustained the objection and instead posed the following question to the venire: "Does anyone here have any strong feelings about immigration or those that are not originally from the United States?" Four prospective jurors responded affirmatively; only one was ultimately selected to sit on the jury. The State and Appellant had an opportunity to question all the prospective jurors individually, and as to those who responded affirmatively to the general question about immigration, Appellant was permitted to explore the nature and extent of any bias those jurors maintained against immigration and immigrants.

---

[8] Appellant is an undocumented immigrant from El Salvador. Around the time of the crimes, the victim had recently immigrated to the United States from Mexico. There is no indication in the record that the jury was informed of Appellant's status as an undocumented immigrant.

"The single purpose for voir dire is the ascertainment of the impartiality of jurors, their ability to treat the cause on the merits with objectivity and freedom from bias or prior inclination." (Citation and punctuation omitted.) *Alexander v. State*, 294 Ga. 345, 346 (2) (751 SE2d 408) (2013). In all criminal cases, OCGA § 15-12-133 gives both the State and the accused the right to individually examine each prospective juror and to inquire about "any matter or thing which would illustrate any interest of the prospective juror in the case," including, as relevant here, "any opinion as to which party ought to prevail . . . [and] any fact or circumstance indicating any inclination, leaning, or bias which the prospective juror might have respecting the subject matter of the action or the counsel or parties thereto[.]" "Nevertheless, the scope of voir dire is not unlimited . . . . [and] the scope of voir dire and the propriety of particular questions are left to the sound discretion of the trial court." (Citations and punctuation omitted.) *Ellis v. State*, 292 Ga. 276, 280-281 (2) (736 SE2d 412) (2013). See also *Ellington v. State*, 292 Ga. 109, 127 (7) (b) (735 SE2d 736) (2012) ("[A]ppellate courts should give substantial deference to the decisions made by trial judges, who oversee voir dire on a regular basis, are more familiar with the details and nuances of their cases, and can observe the parties' and the prospective jurors' demeanor."), disapproved on other grounds by *Willis v. State*, 304 Ga. 686, 706 (11) (a) n.3 (820

15

SE2d 640) (2018). We conclude that Appellant has not shown that the trial court abused its discretion here.

"This is not a case in which the trial court foreclosed all inquiry concerning the subject matter to which the question was directed." *Ellis*, 292 Ga. at 281 (2). Instead, the venire as a whole was questioned to identify prospective jurors with strong feelings about individuals not originally from the United States and about immigration generally. And while the trial court disallowed the politically charged and potentially inflammatory questions Appellant proposed, Appellant does not assert, nor does the record reflect, that the trial court otherwise restricted Appellant's ability to ascertain any bias the prospective jurors held against immigrants.[9]

---

[9] While Appellant asserts on appeal that these questions were intended to ferret out racial bias, at the hearing on his motion for new trial, trial counsel explained that the questions were meant to explore potential bias against Appellant as an immigrant in light of the political climate at the time, specifically "statements made by [former President] Trump in which he referred to immigrants as being from shithole countries that suggested that they were more likely to be criminals than U.S. citizens[.]" As the Tenth Circuit Court of Appeals has explained, "[t]hat immigration sometimes implicates race or ethnicity does not make all cases [involving immigrants] inextricably bound up with race." *United States v. Murry*, 31 F4th 1274, 1289 (II) (A) (10th Cir. 2022) (no abuse of discretion in denial of defendant's request to question prospective jurors about former President Trump's statement regarding "all these people from shit hole countries com[ing] here").

16

Indeed, Appellant was permitted to follow up individually with the venire members who indicated they felt strongly about immigrants and immigration and to further probe any bias the prospective jurors held with respect to immigration or any other matter. Appellant likewise was permitted to individually question the remaining members of the venire more generally about their ability to be fair and impartial. "Because the trial court permitted questions about [immigration and persons not originally from the United States] and any bias on the subject, we find no abuse of discretion in the trial court's decision to restrict the scope of voir dire in the limited manner it did." *Alexander*, 294 Ga. at 348 (2). See also *Ellis*, 292 Ga. at 281 (2); *Reynolds v. State*, 334 Ga. App. 496, 501 (2) (779 SE2d 712) (2015) (no abuse of discretion in limiting scope of general voir dire where appellant "was allowed to pose as many questions as he liked when each of the potential jurors was questioned individually" and "the record show[ed] that the relatively lengthy voir dire . . . was sufficient to ascertain the fairness and impartiality of the prospective jurors").

5. Finally, Appellant asserts that the trial court committed several merger errors

during sentencing.[10] We address each claim in turn.

(a) Appellant first argues that the trial court should have merged Count 7 (sexual battery) with Count 3 (child molestation) and Count 9 (sexual battery) with Count 5 (child molestation). This Court's decision in *Cantrell v. State*, 360 Ga. App. 862, 868 (4) (862 SE2d 329) (2021), controls here. In *Cantrell*, we rejected an identical merger claim to that raised in this case, holding that the offense of sexual battery requires proof of a fact that the offense of child molestation does not – lack of consent[11] – and that the offense of child molestation requires proof of a fact that sexual battery does not – the intent to arouse or satisfy the sexual desires of either the child or the person. Id. Accordingly, the trial court did not err by failing to merge Counts 7 and 3 and Counts 9 and 5 for purposes of sentencing.

---

[10] The trial court sentenced Appellant to serve 20 years for statutory rape (Count 1); 20 years consecutive to Count 1, with one year probated, for child molestation (Count 3); 20 years concurrent with Count 3, with one year probated, for child molestation (Count 5); five years consecutive to Count 5 for sexual battery (count 7); and five years concurrent with Count 1 for sexual battery (Count 9), for an aggregate sentence of 45 years, with 44 years served in confinement.

[11] We note that, effective July 1, 2021, OCGA § 16-6-22.1 has been substantively revised. The statute now provides that "[w]hen the alleged victim is under the age of 16 years and the conduct is for the purpose of sexual arousal on the part of the alleged offender or alleged victim, consent of the alleged victim shall not be a defense to a prosecution under this Code section[.]" OCGA § 16-6-22.1 (f). Because Appellant's trial occurred in 2018, the prior version of the statute applies.

(b) Appellant alleges that the trial court erred by imposing separate sentences for Counts 3 and 5, which contain identical allegations, with the exception of the dates on which the crimes were committed. We agree.

It is well settled that "if the counts in the indictment are identical except for the dates alleged, and the dates were not made essential averments, only one conviction can stand." (Citation and punctuation omitted.) *Thomas v. State*, 352 Ga. App. 640, 642-643 (1) (a) (835 SE2d 640) (2019). "This rule applies in prosecutions for multiple sexual assaults against child victims . . . [a]nd the mere fact that a different date is charged in each count will not of itself make the indictment into a special one where the averment as to date is not particularized." (Citation and punctuation omitted.) *Jones v. State*, 333 Ga. App. 796, 800 (2) (777 SE2d 480) (2015). Here, Counts 3 and 5 of Appellant's indictment are identical, except for the dates, which were not alleged to be material. "Consequently, the State merely needed to prove that the [child molestation charges] occurred within the statute of limitation, making [the charges] legally identical. And, because [Appellant] was charged with the exact same crime twice, he could not then be convicted and sentenced for both counts." *Dukes v. State*, 311 Ga. 561, 572 (4) (858 SE2d 510) (2021).

While the State asserts on appeal that "discrete dates were alleged and proven for both child molestation counts" and that merger is inappropriate, this argument misapprehends the applicable law and is disingenuous in light of the State's position at trial. As this Court has emphasized, "[t]o make such dates a material allegation, the indictment must *specifically allege* that the date of the offense is material." (Citation and punctuation omitted; emphasis in original.) *Torres v. State*, 353 Ga. App. 470, 485 (6) (838 SE2d 137) (2020). The indictment in this case does not specifically allege that the dates of the offenses are material, a fact that the State emphasized during closing argument when it informed the jury that "the State is not restricted to proof of the dates alleged in the indictment but is permitted to prove its commission on any date within the statute of limitation[]" because "it's not alleged in the indictment . . . that this offense date is material." Later, after the trial court had charged the jury and the jury had begun deliberating, the State brought to the court's attention its failure to charge the jury on the State's burden of proof with respect to the dates of the offenses. As a result, the jury was returned to the courtroom where the trial court expressly instructed:

> I charge you that in proving the time of the commission of an offense, the State is not, as a general rule, restricted to proof of the dates alleged in the indictment, but is permitted to prove its commission on any date within

20

the statute of limitation[], unless the indictment specifically alleges the date of the offense to be material.

We thus conclude that the trial court erred by sentencing Appellant on both counts of child molestation, so we vacate the sentences on Counts 3 and 5 and remand this case for the trial court to resentence Appellant on only one of those counts.

(c) Although Appellant does not raise the issue on appeal, we also conclude that the trial court erred by imposing separate sentences for Counts 7 and 9, which, again, are identical except for the dates alleged.[12] Accordingly, for the reasons discussed in Division 5 (b), we vacate Appellant's sentences on Counts 7 and 9 and remand for resentencing on only one of these counts.

*Judgment affirmed in part and vacated in part, and case remanded with direction. Rickman, C. J., and Miller, P. J., concur.*

---

[12] While we are under "no obligation to scour the record searching for merger issues . . . sometimes a merger error is so clear and obvious that it comes to our attention even without the help of any party, and in those instances [on direct appeal], we have the discretion to correct the error upon our own initiative." (Citation and punctuation omitted.) *Dixon v. State*, 302 Ga. 691, 696 (4) (808 SE2d 696) (2017).