311 Ga. 561
FINAL COPY

S21A0399.  DUKES v. THE STATE.

MELTON, Chief Justice.

Following a jury trial, Damarcus Antwuan Dukes was convicted of malice murder and related offenses in connection with crimes committed against Demarius Denham, Dankevion Chatman, and Uzamoake Moh.[1]  On appeal, Dukes raises three claims of trial

---

[1] On March 1, 2019, a Fulton County grand jury indicted Dukes for: one count of malice murder (Count 2 — Denham); three counts of felony murder predicated on aggravated assault, possession of a firearm by a first offender probationer, and participation in criminal street gang activity (Counts 3, 4 and 5 — Denham); three counts of aggravated assault (Count 6 — Denham, Count 7 — Chatman, Count 13 — Moh); one count of aggravated battery (Count 8 — Chatham); one count of hijacking a motor vehicle in the first degree (Count 11 — Moh); one count of armed robbery (Count 12 — Moh); three counts of participating in criminal street gang activity (Counts 1, 5, and 10); and four weapons charges (Counts 9 and 14 — possession of a firearm during the commission of a crime, Counts 15 and 16 — possession of a firearm by a first offender probationer).
At a jury trial from October 21 through 25, 2019, Dukes was found guilty of malice murder (Count 2), two counts of felony murder (Counts 3 and 4), two counts of aggravated assault (Counts 6 and 7), one count of aggravated battery (Count 8), hijacking (Count 11), armed robbery (Count 12), and all four weapons charges (Counts 9, 14, 15, and 16). The trial court directed a verdict of acquittal for the aggravated assault of Moh (Count 13) and entered orders of nolle prosequi for one count of felony murder (Count 5) and the three counts

court error. For the reasons discussed below, we affirm in part, vacate in part, and remand the case with direction.

1. Relevant to this appeal,[2] the evidence presented at trial shows that, on November 30, 2018, Tony Hudgens, one of Dukes' best friends, went to the apartment of a drug dealer known as "Bigs" to buy some marijuana. Sometime thereafter, Dukes arrived; Bigs sold Hudgens some marijuana and then told him to leave. As Hudgens left the apartment building, he saw a black Infiniti pull into the parking lot. Inside that car were Moh and her boyfriend,

---

of participating in criminal street gang activity (Counts 1, 5, and 10). Dukes was sentenced to life in prison without parole for malice murder (Count 2), a concurrent life sentence for armed robbery (Count 12), 20 years consecutive for aggravated battery (Count 8), five years consecutive for possession of a firearm during the commission of a crime (Count 9), 20 years consecutive for hijacking (Count 11), and five years each for the last three weapon charges (Counts 14, 15, and 16) to run consecutive, for a total of life without parole plus 60 years. All remaining counts were either merged for sentencing purposes or vacated by operation of law.

Dukes filed a motion for new trial on October 29, 2019, which he amended through new counsel on July 14, 2020. After a hearing, the trial court denied the motion as amended on October 2, 2020. Dukes timely filed a notice of appeal to this Court. The appeal was docketed to the term of Court beginning in December 2020 and was submitted for a decision on the briefs.

[2] Though this Court has ended its practice of routinely considering sufficiency sua sponte in non-death penalty cases, see *Davenport v. State*, 309 Ga. 385, 391-392 (4) (846 SE2d 83) (2020), we summarize the evidence here to assist with our harmless-error analyses below.

2

Curtis Derricott. Derricott got out of the car and went into one of the apartments while Moh stayed behind.[3] Upon entering the apartment, Derricott got into an altercation with three men, ending with the men taking Derricott's cell phone, shoes, and money and then running out the back door.[4]

Moh, who was still waiting in her car, looked up and saw Dukes standing by her window with a gun by his side. Dukes told her, "Get the f**k out of the car before I blast you." Moh dropped her phone and got out of the car. As she ran, she watched Dukes and three other men get into her car and drive off. Just then, Derricott came out of the building. Moh and Derricott borrowed a phone, called 911, and headed to a nearby gas station to meet the police.

Hudgens, who had made his way to the breezeway of the

---

[3] Derricott testified at trial that he told Moh they were going to the apartment complex to purchase a used Xbox game console for Moh's children. However, Derricott was actually going to purchase marijuana.

[4] There was evidence presented at trial that Bigs arranged the robbery of Derricott, and that Derricott later told Denham and Chatman that he was robbed by Bigs. However, at trial, Derricott testified that he was unable to identify the men who had robbed him.

3

nearby Ashford Oaks apartment complex, saw the same black Infiniti enter the parking lot and back into a spot. Hudgens saw Dukes step out of the car with three other men;[5] the group emptied the car of its contents and then began selling the stolen items. At one point, Denham and Chatman, who knew Dukes, approached the group because Denham wanted to buy a toy car for his son. Chatman gave Denham a $100 bill, told Denham to go to a nearby gas station to purchase some drinks and cigarettes, and then return with the change to buy the toy.

When Denham arrived at the gas station, Derricott and Moh were speaking with the police. Derricott saw Denham, who was a family friend, and told him that he had just been robbed. Denham asked if Moh had an Infiniti because someone "just hit for an Infiniti," to which Derricott replied "yes." Moh stayed with officers at the gas station while Denham drove Derricott to the Ashford Oaks apartment complex. After Derricott identified Moh's car, Denham

---

[5] Dukes later admitted to Hudgens that he had participated in the carjacking.

4

drove Derricott back to the gas station and told Derricott that he would get back all of Derricott's belongings.

Denham called Chatman and told him that Derricott had been robbed, and that the Infiniti parked at Ashford Oaks belonged to his friends. When Denham returned to Ashford Oaks, he and Chatman confronted Dukes about the robbery. Though Chatman remained calm, Denham became passionate during the discussion. When the verbal exchange between Denham and Dukes turned heated, Dukes brandished a gun and shot Denham. As Chatman attempted to move Denham away from the gunfire, Chatman was shot in the shoulder. Denham suffered five gunshot wounds to the torso and died at the scene. Chatman was shot multiple times, but was able to escape from the shooting before collapsing at a friend's nearby apartment.

At trial, a stipulation was read to the jury that Dukes was on first offender probation at the time of the November 2018 crimes. Dukes took the stand and testified that Denham became aggressive during their confrontation and eventually reached for a gun. He testified that he shot Denham in self-defense and also admitted

shooting Chatman, but claimed it was an accident. Jerrod Williams was called as a witness for the defense and testified that, when Denham arrived in the breezeway, he was "already on whatever he was on. He was already tripping" and was acting like "he was fittin' to do something to us." Both Williams and Hudgens testified that, during the pre-shooting confrontation, Denham left the argument and returned with a gun on his waistband. However, no weapon was found at the scene of the shooting.

2. Dukes alleges that the trial court abused its discretion by allowing both Derricott and Hudgens to testify to inadmissible hearsay. The State argues that Derricott's testimony about a hearsay statement by Moh was properly admitted as an excited utterance, see OCGA § 24-8-803 (2), and that, though Chatman's statement was admitted in error through Hudgens' testimony, that error was harmless. We agree with the State.

(a) *Testimony of Derricott.*

The record shows, in pertinent part, that Moh testified about the hijacking and robbery and identified Dukes as her assailant.

6

She explained that, immediately after the carjacking, she saw Derricott and told him, "They stole my car." Derricott testified after Moh, and the following exchange occurred:

PROSECUTOR: What was [Moh] doing?
DERRICOTT: Crying.
PROSECUTOR: Do you know why she was crying?
DERICOTT: Somebody just took her car.
DUKES: Objection to hearsay.
PROSECUTOR: Your Honor, the witness has already testified.
COURT: Overruled. You can answer.
DERRICOTT: Somebody had took the car from her.
PROSECUTOR: Did you actually see anybody take the car from her?
DERRICOTT: No.
PROSECUTOR: Where were you when that was happening?
DERRICOTT: Inside.
DUKES: Objection. Speculation.
COURT: Overruled.
PROSECUTOR: Let me ask you this, Mr. Derricott: when you left – when you got out of the car and went inside the apartment, was [Moh] still in the car?
DERRICOTT: Yes.
PROSECUTOR: Was the car still outside?
DERRICOTT: Yes.
PROSECUTOR: After the altercation and you left the apartment, was the car still there?
DERICOTT: No.
PROSECUTOR: What did [Moh] tell you?
DERRICOTT: Somebody took the car.

Dukes alleges that Derricott testified to inadmissible hearsay regarding Moh's statement about her car being stolen. We see no error. "[A] trial court's decision whether to admit or exclude evidence will not be disturbed on appeal absent an abuse of discretion." *Lyons v. State*, 309 Ga. 15, 21 (4) (843 SE2d 825) (2020). Here, the record shows that Moh was still in a state of excitement resulting from the robbery when she informed Derricott that her car was stolen. And "whether a hearsay statement was an excited utterance is determined by the totality of the circumstances. . . . The critical inquiry is whether the declarant is still in a state of excitement resulting from that event when the declaration is made." (Citations and punctuation omitted.) *Atkins v. State*, 310 Ga. 246, 250 (2) (850 SE2d 103) (2020). Moh was crying when she told Derricott that her car had been stolen, and the statement was made immediately after the event. See *Blackmon v. State*, 306 Ga. 90, 94 (2) (829 SE2d 75) (2019) (victim's statements made moments after startling event fell under excited utterance exception). Accordingly, the trial court did not abuse its discretion by admitting Moh's

8

hearsay statement into evidence.

(b) *Testimony of Hudgens*

Later in the State's case-in-chief, Chatman was called as a witness and testified concerning his initial discussion with Dukes regarding the robbery of Derricott and Moh. Specifically, Chatman testified, in pertinent part:

PROSECUTOR: You heard the name Bigs from Dukes?

CHATMAN: Yeah.

PROSECUTOR: How did that come about?

CHATMAN: When — can I say?

PROSECUTOR: Yes.

CHATMAN: When I said y'all know y'all robbed my folks, right, he went, for real, big bro. I'm like yeah. . . . And then [Dukes] was like, man, let me call this n***a Bigs right quick. He pulled out his phone.

PROSECUTOR: So when you said you know y'all robbed my folks —

CHATMAN: Right.

PROSECUTOR: — who were you saying that to?

CHATMAN: I was saying that to [Dukes] and Slim and them.

PROSECUTOR: How did [Dukes] react when you said that specific statement?

CHATMAN: He said, for real, big bro. Like for real, like that.

PROSECUTOR: So after he said for real, what did he do next?

CHATMAN: He pulled his phone out.

```
PROSECUTOR:     Do you know who he called?
CHATMAN:        Bigs.
PROSECUTOR:     How do you know that?
CHATMAN:        Because he said it on his phone.
PROSECUTOR:     Do you know if [Dukes] ever actually
spoke to Bigs?
CHATMAN:    It went to the voicemail. He put it on
speaker.
PROSECUTOR:     So you could hear the voicemail?
CHATMAN:        Yeah.
PROSECUTOR:     After [Dukes] tried to call Bigs, how
did [Dukes] react to getting voicemail?
CHATMAN:            He  was  just  like  —  he  was
frustrated.  Called [Bigs] about five times. . . . He called
[Bigs] about five times back to back.
```

Chatman testified that, as Dukes was attempting to reach Bigs, Denham was talking passionately to the group in the breezeway and making a bit of a scene.  Chatman explained that, when Dukes failed to reach Bigs, he yelled, "[T]his is bulls**t," which caused Denham to respond, "[A]in't nobody even talking to you."

Hudgens was called as a witness after Chatman.  During his direct examination, Hudgens testified that, prior to the shooting, Dukes said that Bigs had "triple-crossed" him regarding the robbery.  During this testimony, the following exchange occurred:

```
PROSECUTOR:     And   when   you   were   at   the
```

apartment complex, after you saw [Dukes] in the car, did [Dukes] say anything about Bigs?

HUDGENS: No.

PROSECUTOR: No?

DUKES: Objection to relevance, your Honor, and hearsay. And it's not related to this case.

COURT: Overruled.

HUDGENS: But Bigs had a main part of everything, how I see it. How I see it, he put everything together.

PROSECUTOR: Okay. Well, I'm just sticking with what —

HUDGENS: Yeah. Yeah. Yeah.

PROSECUTOR: — with [Dukes] and what you heard [Dukes] say. Okay? So did you ever hear the word "Bigs" come out of [Chatman's] mouth?

HUDGENS: Yeah.

DUKES: Objection to hearsay.

PROSECUTOR: Your Honor, the witness has already testified.

HUDGENS: Yes, sir, I did.

COURT: Hold on. Overruled. He can answer.

PROSECUTOR: Did you ever hear the word "Bigs" come out of [Chatman's] mouth?

HUDGENS: Yeah.

PROSECUTOR: After you heard the word "Bigs" come out of [Chatman's] mouth, what did [Dukes] say?

HUDGENS: [Dukes] didn't say nothing. [Chatman] said to me —

DUKES: Objection to what [Chatman] said.

COURT: Sustained. Ask a new question.

PROSECUTOR: Did [Dukes] mention anything about Bigs triple[-]crossing him?

HUDGENS: Yes.

11

Dukes objected again, arguing that his statement about Bigs triple-crossing him was inadmissible hearsay because it did not qualify as a statement against self-interest.[6]    The prosecutor responded, in pertinent part:

> So with respect to the statement made by [Dukes] as to Bigs triple[-]crossing him, as Mr. Chatman has already testified that [Dukes] was trying to get on the phone with Bigs after [Chatman] said, you know, y'all robbed one of my friend's people, and the response from Mr. Dukes was, oh, for real, let me get in touch with Bigs, Mr. Dukes attempts to get in touch with Bigs five separate times. And this supports Mr. Hudgens' statements as to Bigs triple[-]crossing him, supports and makes it more or less — is more probative as to whether or not [Dukes] was involved in the carjacking that took place with respect to the incident that occurred prior to the homicide.

On appeal, Dukes alleges that Hudgens' testimony that he heard Chatman say Bigs' name was inadmissible hearsay.  We agree with the State that any error in the admission of this testimony was harmless.  See *Jackson v. State*, 306 Ga. 69, 80 (2) (c) (829 SE2d 142) (2019) ("[T]he test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to

_____

[6] Dukes does not challenge the trial court's ruling on this objection; we merely include it for context.

the verdict." (Citation and punctuation omitted)).  The record shows that the testimony served a limited purpose — to further support the State's case regarding the carjacking.  Moreover, the State's case against Dukes regarding the carjacking he committed against Moh was strong.  The evidence showed that Dukes was at Bigs' apartment immediately prior to the carjacking.  Two witnesses saw Dukes driving the stolen black Infiniti, Moh positively identified him as the assailant who held her at gunpoint and took her car, and Dukes admitted to his best friend that he participated in the carjacking.  Finally, as shown above, Hudgens' brief testimony that he heard Chatman say Bigs' name was cumulative of Chatman's prior testimony on the same subject, and the testimony was not directly related to the shooting or to Dukes' claims of self-defense and accident.  Accordingly, it is highly probable that Hudgens' testimony did not contribute to the verdict.  See *Anglin v. State*, 302 Ga. 333, 342 (6) (806 SE2d 573) (2017).

3.    Dukes alleges that the trial court erred by excluding expert testimony from Dr. Michael Heninger, the Fulton County

medical examiner, about how amphetamines would have affected Denham's behavior prior to the shooting. We see no reversible error.

During its case-in-chief, the State called Dr. Heninger to testify about Denham's autopsy. During his direct examination, Dr. Heninger testified that Denham had 0.11 milligrams of amphetamine per liter in his blood at the time of his death. On cross-examination, defense counsel asked Dr. Heninger to explain what amphetamines were, to which Dr. Heninger testified that "[a]mphetamine is a stimulant that was invented in World War II to keep pilots awake. It was used quite a bit. It has a lot of toxic effects. One of its derivatives is methamphetamine or meth, which is — ." The State raised a relevance objection at this point, and defense counsel responded, "The relevance is the condition of the victim at the time that the event happened. It's a self-defense case, your Honor." The State replied that Dr. Heninger was not qualified to give an expert opinion on the effects of amphetamines on the body as he had only been qualified as an expert in forensic pathology. The trial court instructed Dukes to lay the foundation that Dr. Heninger

14

was qualified to testify as to the effect of amphetamines on a person before going into that specific line of questioning.

Dukes then elicited testimony that Dr. Heninger was a medical doctor, that he had taken courses in pharmacology, that he had prescribed medications, and that he was aware of the effects of amphetamines on a person's "fight or flight" response. He testified that the focus of his practice was to determine cause of death, including when medications caused death. When asked what the effect of amphetamines was on the body, Dr. Heninger responded, "It's a stimulant. It makes people not sleep. It makes – kind of raises their heart rate, gets them ready to do fight or flight, that kind of thing." The State objected, again arguing that Dukes had still not laid a proper foundation. Defense counsel responded:

> He's already testified to it. And that's all I'm going to ask him. I'm not going to ask him anything further, particularly not with respect to this defendant because he's not qualified to testify to that, to this particular defendant under these particular circumstances.

The trial court sustained the State's objection, granted the State's motion to strike the last portion of the medical examiner's

testimony, and instructed the jury to disregard Dr. Heninger's last statement.

On appeal, Dukes claims that the trial court erred by striking the last portion of Dr. Heninger's testimony and by prohibiting counsel from further cross-examining the medical examiner about the effects of amphetamines on a person. As an initial matter, the portion of Dukes' enumeration claiming trial court error for prohibiting further cross-examination is not preserved for appellate review. In response to the prosecutor's last objection, Dukes informed the trial court, "That's all I'm going to ask him," and further acknowledged that Dr. Heninger was not qualified to give any additional testimony on the topic. And, "[a]ffirmative waiver, as opposed to mere forfeiture by failing to object, prevents reversal." *Wallace v. State*, 303 Ga. 34, 37 (2) (810 SE2d 93) (2018). Accordingly, this portion of Dukes' claim is not preserved for appellate review.

Turning to the portion of Dukes' claim concerning the trial court's striking of Dr. Heninger's testimony that amphetamine is "a

stimulant. It makes people not sleep. It makes — kind of raises their heart rate, gets them ready to do fight or flight, that kind of thing," any error in striking this testimony was harmless. Dr. Heninger had previously testified to the stimulant effect of amphetamines on a person's system. Further, the medical examiner's testimony was cumulative of other, more specific evidence of Denham's alleged pre-shooting aggression. The record shows that the jury heard from other witnesses, and from Dukes himself, that Denham: appeared to be "tripping"; was volatile during the pre-shooting confrontation; was passionate and making a scene prior to the shooting; and at one point during the confrontation, left and returned with a handgun. Finally, as defense counsel conceded, Dr. Heninger was "not qualified to testify to that, to this particular defendant under these particular circumstances," and, instead, could only testify as to generalities. Based on the foregoing, even if we were to assume that the trial court erred in striking the last portion of Dr. Heninger's testimony, any alleged error was harmless. See *Jackson*, supra, 306 Ga. at 80 (2) (c).

4. Dukes alleges that the trial court erred by imposing separate sentences for Counts 15 and 16 of his indictment. Count 15 charged Dukes

> with the offense of possession of a firearm by a first offender probationer OCGA § 16-11-131 (b), for the said accused, in the County of Fulton and State of Georgia, on the 30th day of November, 2018, sometime between the hours of 7:00 p.m. and 7:35 p.m., did knowingly and without lawful authority possess a certain firearm, to wit: a handgun; accused having been sentenced pursuant to Article 3 of Chapter 8 of Title 42 of the Official Code of Georgia Annotated to a term of probation as a Felony First Offender on March 18, 2014, by the Superior Court of DeKalb County, Indictment Number 14CR1690 — contrary to the laws of said State, the good order, peace and dignity thereof.

Count 16 of the indictment charged Dukes

> with the offense of possession of a firearm by a first offender probationer OCGA § 16-11-131 (b), for the said accused, in the County of Fulton and State of Georgia, on the 30th day of November, 2018, sometime between the hours of 6:00 p.m. and 6:35 p.m., did knowingly and without lawful authority possess a certain firearm, to wit: a handgun; accused having been sentenced pursuant to Article 3 of Chapter 8 of Title 42 of the Official Code of Georgia Annotated to a term of probation as a Felony First Offender on March 18, 2014, by the Superior Court of DeKalb County, Indictment Number 14CR1690 – contrary to the laws of said State, the good order, peace and dignity thereof.

Dukes contends that his sentences on these two counts should have merged because the State failed to make the times of the handgun possessions material averments in the indictment. Because of this, Dukes argues that double jeopardy precluded the trial court from sentencing him on both counts. We agree.

First, we must determine whether Dukes' claim is one of procedural or substantive double jeopardy. "Procedural protections against double jeopardy apply only to multiple prosecutions, meaning multiple or successive indictments or criminal proceedings. These procedural protections do not apply to a single indictment that contains multiple counts, even if those counts are deemed multiplicitous." (Citation and punctuation omitted.) *Williams v. State*, 307 Ga. 778, 779 (1) (838 SE2d 235) (2020). By contrast, the doctrine of substantive double jeopardy is triggered in situations that involve multiple convictions and sentences, which is typically addressed by this Court's merger practice. See id. at 780-781. Because this case clearly falls into the latter category, we turn to our

19

case law concerning substantive double jeopardy and merger.

As we explained in *Scott v. State*, 306 Ga. 507 (832 SE2d 426) (2019):

> "Merger" refers generally to situations in which a defendant is prosecuted for and determined by trial or plea to be guilty of multiple criminal charges but then, as a matter of substantive double jeopardy law, can be punished – convicted and sentenced § for only one of those crimes. See generally OCGA § 16-1-7 (a); *Drinkard* [*v. Walker*, 281 Ga. 211, 212 (636 SE2d 530) (2006)]. Merger analysis often involves counts charging two *different* crimes. As this Court has made clear, that is the context in which *Drinkard*'s "required evidence" test is applied. See *Smith v. State*, 290 Ga. 768, 773 n.4 (723 SE2d 915) (2012) ("(T)he 'required evidence' test (only applies) 'where the same act or transaction constitutes a violation of *two distinct statutory provisions*(.)'" (emphasis in original) (quoting *Drinkard*, 281 Ga. at 215)).
> But merger questions may also arise when a defendant is charged with multiple counts of the *same* crime . . . . In this context, the merger analysis requires careful interpretation of the criminal statute at issue to identify the "'unit of prosecution'" — "'the precise act or conduct'" that the legislature criminalized. *Smith*, 290 Ga. at 773 (emphasis omitted) (quoting *State v. Marlowe*, 277 Ga. 383, 384 (589 SE2d 69) (2003)). See also *Coates v. State*, 304 Ga. 329, 330 (818 SE2d 622) (2018).

(Footnote omitted; emphasis in original.) *Scott*, supra, 307 Ga. at 509 (2). Here, Dukes was charged with multiple counts of the same

crime — i.e., possession of a firearm by a first offender probationer. And, while this would normally trigger a "unit of prosecution" question, we need not perform such an analysis here. Instead, we agree with Dukes that the State's failure to make the timeframe of the handgun possessions material allegations within the indictment caused Dukes to be improperly convicted and sentenced for the identical crime twice.

Generally speaking, when proving the time an offense was committed, the State is not "restricted to proof of the date alleged in the indictment, but is permitted to prove its commission on any date within the statute of limitations." (Citations and punctuation omitted.) *Ledesma v. State*, 251 Ga. 885, 885 (1) (a) (311 SE2d 427) (1984). "Where, however, the indictment specifically alleges the date of the offense is material, the accused may be convicted only if the State's proof corresponds to the date alleged." Id. See also *Price v. State*, 247 Ga. 58, 59 n. 1 (273 SE2d 854) (1981) ("If the indictment alleges the date of the offense to be material, the proof must correspond to the date alleged and a res judicata plea does not lie as

21

to any other date. On the other hand, if the indictment does not allege the date of the offense to be material, the defendant may be convicted of the offense alleged in the indictment on any date within the statute of limitations, and res judicata may be pleaded to any other similar offense within such period."). Indeed, "the state must prove all material allegations in an indictment which describe the offense or the particular manner in which the offense was committed." (Citation and punctuation omitted.) *Griffin v. State*, 294 Ga. 325, 328 (751 SE2d 773) (2013).

Here, the State did not include language in the indictment to make the times that Dukes possessed a handgun (between 6:00 p.m. and 6:35 p.m. in Count 16, and between 7:00 p.m. and 7:35 p.m. in Count 15) material allegations to be proven at trial. Furthermore, the jury was not instructed that the specific times Dukes possessed a handgun were material elements of the crimes that the State was required to prove beyond a reasonable doubt. Consequently, the State merely needed to prove that the two gun charges occurred

within the statute of limitation,[7] making Dukes' gun charges legally identical. And, because Dukes was charged with the exact same crime twice, he could not then be convicted and sentenced for both counts.

Based on the foregoing, we vacate Dukes' convictions and sentences for the two counts of possession of a firearm by a first offender probationer and remand this case for the trial court to convict and resentence Dukes on only one of these counts.

5. Finally, in a single sentence, and without any argument or analysis, Dukes alleges that the combined trial court errors alleged in Divisions 2 and 3, supra, denied him a fundamentally fair trial. However, we have repeatedly emphasized that, "in the evidentiary context, a defendant who wishes to take advantage of the [cumulative error rule] should explain to the reviewing court just how he was prejudiced by the cumulative effect of multiple errors."

---

[7] OCGA § 16-11-131 (b) provides: "Any person who is on probation as a felony first offender . . . and who receives, possesses, or transports any firearm commits a felony[.]" The statute of limitation for a violation of OCGA § 16-11-131 (b) is generally four years. See OCGA § 17-3-1 (c).

*State v. Lane*, 308 Ga. 10, 18 (1) (838 SE2d 808) (2020).  Because Dukes has failed to make anything other than a cursory statement that he was denied a fundamentally fair trial, and because no such cumulative prejudice is apparent to us on this record, this claim fails.

*Judgment affirmed in part and vacated in part, and case remanded with direction.  All the Justices concur.*

Decided May 17, 2021.

Murder. Fulton Superior Court. Before Judge Ellerbe.

*Jackie L. Tyo*, for appellant.

*Fani T. Willis, District Attorney, Lyndsey H. Rudder, David K. Getachew-Smith, Sr., Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Leslie A. Coots, Assistant Attorney General*, for appellee.