**FIRST DIVISION**
**BROWN, C. J.,**
**BARNES, P. J., and WATKINS, J.**

**NOTICE:** Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

**December 12, 2025**

# In the Court of Appeals of Georgia

A25A2207. WEST v. THE STATE.

BARNES, Presiding Judge.

A jury found Valerie West guilty of neglect to a disabled adult, terroristic threats, four counts of depriving a disabled adult of essential services, exploitation of a disabled adult, and identity fraud. On appeal from the denial of her motion for new trial, West challenges the sufficiency of the evidence and contends that her trial counsel was constitutionally ineffective by failing to file a general demurrer to the indictment. As explained below, we reverse West's conviction for exploitation of a disabled adult due to insufficient evidence. We affirm the judgment in all other respects.

Construed in the light most favorable to the verdict,[1] the evidence showed that West managed three group homes for disabled adults in DeKalb County, Georgia: 3797 Conley Downs Drive, 3527 Lehigh Way, and 2239 Hampton Drive.[2] The three homes were owned by West's husband, but West was "in charge" of the homes and received rent from the disabled adults who lived there. Relatives of residents who were placed in West's homes testified that rent was to include shelter, food, and other forms of assistance. There also was testimony from residents and other witnesses reflecting that residents believed they were paying to live in a personal care home.

As a result of their disabilities, many of the residents in West's group homes were entitled to monthly Social Security disability benefits, and West or her adult daughter, Erica West, applied for and became the designated "representative payee" for many of them. As representative payees, West and her daughter were entitled to receive disability payments on behalf of the residents and were required to use the

---

[1] See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

[2] "Lehigh" is sometimes spelled as "Leehigh" in the trial transcript.

2

funds for the residents' benefit. See 20 CFR §§ 404.2035 (a), 416.635 (a).[3] On several applications to become a representative payee, West identified herself as a caregiver employed by a personal care home company formed by her husband. On one occasion, West used funds drawn from her bank account into which disability benefits were deposited to buy a designer purse. West also continued to collect and use the disability benefits of one resident, Joe Banks, for several years after he died.

The allegations of the indictment and the State's evidence at trial centered on the conditions of West's group homes and the experiences of several residents who lived there during the 2017-2019 time period.

*Jonathan Polizzi.* Polizzi was a resident of West's group homes on Conley Downs Drive and Lehigh Way. He was born deaf and mute, and he suffered from Swyer-James syndrome, a disease of the lungs that made him susceptible to infections,

---

[3] A representative payee generally is appointed for the beneficiary of disability benefits where the Social Security Administration has "determined that the beneficiary is not able to manage or direct the management of benefit payments in his or her own interest." 20 CFR §§ 404.2001 (a), 416.601 (a). The representative payee receives the benefits on behalf of the beneficiary and must use those payments only for the benefit of the beneficiary and in the beneficiary's best interests. 20 CFR §§ 404.2035 (a), 416.635 (a). Payments are considered to have been for the use and benefit of the beneficiary "if they are used for the beneficiary's current maintenance," which "includes costs incurred in obtaining food, shelter, clothing, medical care and personal comfort items." 20 CFR §§ 404.2040 (a) (1), 416.640 (a).

pneumonia, and emphysema and that caused him to develop an enlarged heart and cardiomyopathy. Polizzi also had chronic obstructive pulmonary disease and required two to three liters of continuous oxygen through use of an oxygen concentrator, which required electricity to function properly. He had a shortened esophagus, which caused him to have difficulty swallowing, blood pressure issues, and anemia, and he suffered from major depression. As a result of his medical disabilities, Polizzi received Social Security disability benefits.

In September 2017, Polizzi had major surgery on his gastrointestinal tract, and a feeding tube was inserted into his abdomen so that he could receive continuous nutrition. The feeding tube required cleaning and flushing with hot water every four hours so that it would not get clogged. A feeding pump connected to the tube required electricity to deliver hydration and nutrition to Polizzi. His medications had to be crushed and were delivered through his feeding tube.

After his 2017 surgery, Polizzi was placed in a skilled nursing home facility for rehabilitation. Polizzi then went to live at West's group home on Conley Downs Drive, where he was one of about seven residents. West identified herself on health care forms as Polizzi's caregiver, and West's daughter applied for and became the

4

representative payee who received Polizzi's disability benefits that were to be used for his rent and other living expenses.

At the Conley Downs home, Polizzi stayed on a couch in the living room because he did not have a bed. When West initially brought Polizzi to the home, she dropped him off and told the other residents that she would be back to get him, but he ultimately lived there for almost a year. The physical therapy services that Polizzi was to receive after his surgery were never set up. Polizzi would run out of food and have trouble with his equipment because the electricity would turn off. When Polizzi texted West's daughter to ask for more oxygen, she responded that "he would have to learn how to do it on his own." Polizzi did not bathe or shower, and there was no hot water at the house. One of the other residents told West and her daughter that Polizzi was getting sicker, and West said that she would come to the home to check on him, but she never did.

In June 2018, Iris Williams visited her disabled sister, who was a resident at the Conley Downs home. When Williams visited the home, Polizzi would be on the couch in a fetal position, and he appeared to be getting smaller over time. Williams noticed that Polizzi had an oxygen tank and feeding tube, but no one appeared to be taking care

of him. Although Polizzi could not speak, other residents would complain to Williams that they were cold, the gas was cut off, there was no food, and the electricity would go on and off. There were roaches and bedbugs crawling around the house, insect bites observable on the residents, and mattresses throughout the house on the floor where residents slept and which had blood on them from residents who had been bitten. The carpet had been pulled up, exposing nails in the floor, and there was no hot water. Because Polizzi appeared to be very sick and the other disabled residents lacked any supervision, Williams called 911 and requested a welfare check.

The DeKalb County police officer who responded to the 911 call arrived at the house and noted that Polizzi was on the couch, emaciated and unable to communicate. Polizzi had several visible insect bites, and bedbugs were crawling on a nearby mattress. The electricity was off, and the food in the refrigerator was spoiled. There was no hot water, and the kitchen stove did not work. Another resident complained that there was no food. After observing the state of the house and Polizzi's condition, the officer contacted emergency medical personnel.

Polizzi was transported by ambulance to the hospital. According to the emergency room physician who treated Polizzi, he had passed out from lack of oxygen,

and he was malnourished, frail, and dehydrated. He was 42 years old and weighed 80 pounds. He had bedbugs crawling on his skin. Polizzi communicated with the hospital staff through a sign language interpreter, and he told them that he felt unsafe where he was living, that his equipment could not work properly with the electricity going on and off, and that the house was unclean.

A hospital social worker contacted West and informed her of Polizzi's condition, but West said that she did not own the house, accused the social worker of asking too many questions, warned her that she should not listen to people with mental health conditions, and told her to contact her daughter. The social worker contacted West's daughter and allowed her to pick Polizzi up from the hospital after she agreed to bring an oxygen tank and take him to a different home.

West's daughter picked up Polizzi from the hospital, but West at some point took Polizzi back to her Conley Downs group home before later dropping him off at her Lehigh Way group home, which had several other disabled residents. Another Lehigh Way resident observed that Polizzi would lie on the couch without moving and would soil himself. When the resident told West that Polizzi was sick, she responded

7

that Polizzi was "faking it." According to the resident, West's daughter visited Polizzi "maybe a couple [of] times" at the Lehigh Way home.

On the morning of July 25, 2018, West's daughter called 911 after arriving at the Lehigh Way home and discovering that Polizzi had died. Emergency medical personnel arrived and observed that Polizzi was in an advanced stage of rigor mortis. Polizzi weighed 62 pounds, having lost almost a fourth of his body weight in the five weeks since his emergency room visit. Although Polizzi had not previously been incontinent, he was wearing an adult diaper at the time of his death, and the area where his feeding tube was inserted was infected.

*Juanita Johnson.* Johnson was a resident of West's group home on Conley Downs Drive, and her stay there overlapped for a period of time with Polizzi. Johnson was around 60 years old when she lived at the home, and she suffered from anxiety and depression and received Social Security disability benefits. After Johnson moved into the Conley Downs home, West took her to the Social Security Administration office and applied to become her representative payee, attesting that she took care of Johnson and visited her every day. West's daughter ultimately became Johnson's representative payee.

Johnson would sometimes ride the bus, and West initially gave her money to buy groceries for the residents and asked her to cook for them, but West later stopped giving Johnson any money for food, and Johnson ceased cooking for the others. According to Johnson, the electricity would go out for extended periods, there was no hot water, and there were bedbugs. West told Johnson and the other residents not to call 911 if there was a problem and to instead call her so that she could handle it, and she would get angry if anyone called 911. Johnson testified that the residents were not supposed to let anyone come inside the house.

*Daniel Stewart.* Stewart was a resident of West's group home on Lehigh Way during the same time period as Polizzi. He was in his mid-20s when he lived there, and he was on the autism spectrum and received Social Security disability benefits. Stewart had been living in a psychiatric facility, but his aunt found West's name in a directory of personal care homes and contacted her about placement. Stewart believed he was moving from the psychiatric facility into a personal care home. After Stewart moved into the Lehigh Way home, West became the representative payee for his benefits. West paid him an "allowance" after taking out money for his rent, but she did not increase her payments to him when his benefits increased after his father died.

According to Stewart, the air conditioning at the Lehigh Way home was usually turned off during the summer, causing the house to be very hot, and the residents could not access the thermostat because it was in a locked case. The front door was locked, so residents could only use the side door, and the door to the laundry area also was locked, so residents could not wash their clothes there. Stewart testified that at one point the house had around ten residents, most of the residents stayed in the living room or the garage on couches, the living room had an exposed concrete floor where the flooring had been removed, the hot water was sometimes off, and the electricity went off at random times. There was no food in the refrigerator or cabinets, the door labeled "pantry" was locked, and residents relied on West to bring over food, which she sometimes brought only once a day. There also were problems with roaches and bedbugs, but when Stewart complained to West, she did not correct the problem. Stewart testified that West told them to call her rather than 911, and he related that West would sometimes get angry and aggressive with residents, threatening them with a baseball bat and spraying a resident with bear mace at one point. The relative of another resident also testified about West's temper, relating that West once

threatened to break her neck when she questioned West about where the resident had been placed.

*Anthony Ridley.* Ridley was a resident at West's group home on Hampton Drive along with several other disabled residents. He was in his early 50s when he lived there, and he suffered from Parkinson's disease, schizophrenia, and bipolar disorder. Because of his Parkinson's disease, Ridley could only walk short distances and had a history of falls. According to another resident, once Ridley moved to Hampton Drive, he stayed mostly in bed and did not bathe.

On June 2, 2018, Ridley got into an argument with another resident because he "never had anything to eat" and was hungry. The other resident — who was aggressive, needed medication but was not receiving it, and was later civilly committed to a state psychiatric facility — struck Ridley with an iron stove eye, causing a large gash on his lip. None of the residents initially called 911 because, as previously noted, West had told them never to call. However, one resident called 911 two days later because Ridley was crying and in pain.

When a police officer responded to the 911 call, the officer noted that the Hampton Drive home had a rancid smell, the floors were dirty, and there were holes

in the walls. The kitchen sink was missing, there was no electricity, and there was little food. One of the residents told the officer that the home was a personal care facility and that Ridley had been injured in a physical altercation.

Ridley was transported to the hospital for treatment of his injuries. Once there, Ridley reported to the emergency room physician that he and the other residents were frequently left unattended. Ridley told the physician about the assault and stated that he had other falls and accidents at the house due to not being watched. He complained of pain to his ribs and face, and the physician observed that Ridley was disheveled and in a poor state of hygiene, did not appear to be fully aware of what was happening, had missing teeth and abscesses in his mouth, and had the laceration on his lip. The laceration could not be stitched because too much time had passed and there was a risk of infection if the wound was closed. Ridley also had two fractured ribs, as well as pressure ulcers on his buttocks and heel that were consistent with a lack of mobility.

*Calvin Coney.* Coney was a resident of West's group home on Hampton Drive when he was in his 30s.[4] He suffered from schizophrenia and received Social Security disability benefits, and his cousin served as his representative payee. Although Coney

---

[4] The indictment referred to "Kevin Coney," but the parties agreed that this was an immaterial scrivener's error.

was supposed to have his own bedroom, he slept on the floor in the living room and had a blanket but no mattress.

According to a Department of Community Health compliance auditor who interviewed Coney and other residents and inspected the Hampton Drive home, there was no kitchen sink, the knobs on the gas stove had been removed, there was little food in the refrigerator and no food in the cabinets, and there were rat or mouse droppings in the kitchen and bedbugs on the beds. The home did not have hot water and had two broken toilets. Another resident testified that there was no working stove or sink, that the hot water rarely was on, and that the electricity would often be turned off. Squirrels came through holes in the door, and there were roaches and bedbugs in all of the rooms. According to the resident, West would sometimes come by the house and was aware of its condition but did nothing in response.

West was indicted on charges of neglect to a disabled adult, trafficking of a disabled adult, terroristic threats, four counts of depriving a disabled adult of essential services, aggravated assault, exploitation of a disabled adult, and identity fraud. The trafficking and aggravated assault counts were later nolle prossed, and West was tried

on the remaining eight counts.[5] At the ensuing jury trial, the State called multiple witnesses — including several residents of West's group homes, responding officers and investigators, hospital and medical personnel, Medicaid fraud investigators, and a Social Security Administration claims specialist — and introduced into evidence over 1,600 pages of photographs, documents, and medical records, as well as 911 recordings and police body camera footage.

The State also called a Georgia Power customer service analyst as a witness, who explained that the accounts for West's group homes were set up under Georgia Power's prepayment program with West as an authorized user on all of the accounts. Under that program, a customer places money in the account, and money is deducted from the account as electricity is used. The customer then is notified when the balance on the account falls to $5. Once the balance reaches zero, the meter is shut down remotely by radio wave, and power is restored, typically within minutes, when a customer makes a payment. Georgia Power records showed that electric service to all

---

[5] West's husband and daughter were indicted and tried with West. The trial court granted directed verdicts of acquittal on all counts brought against West's husband. The trial court directed verdicts of acquittal on two counts against West's daughter, and the jury convicted her on four remaining counts. West's daughter has not appealed her convictions.

three of West's group homes was interrupted numerous times for nonpayment, including on the two days preceding Polizzi's death. On one occasion, in August 2018, West called to complain about the power at Lehigh Way costing more than $16 even though she had turned the air conditioning off for the last three days.

After the State rested, West's husband and daughter testified in addition to other defense witnesses. West elected not to testify. The defense argued that the evidence showed that the homes rented out by West were cheap boarding houses rather than personal care homes, that the conditions of the homes were not as dire as asserted by the State, and that West had no duty and was not obligated to provide care or services to her residents.

The jury returned a verdict finding West guilty on all eight counts. West filed a motion for new trial, as amended, challenging the sufficiency of the evidence and asserting that her trial counsel rendered ineffective assistance. The trial court denied the motion, resulting in this appeal.

1. West contends that the evidence was insufficient to support several of her convictions.[6]

---

[6] West does not challenge the sufficiency of the evidence supporting her conviction of terroristic threats.

When reviewing the sufficiency of the evidence, the proper standard for review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. This Court does not reweigh evidence or resolve conflicts in testimony; instead, evidence is reviewed in a light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence.

*Floyd v. State*, 321 Ga. 717, 720 (1) (917 SE2d 93) (2025) (citations and punctuation omitted). See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

(a) Guided by this standard of review, we turn first to West's conviction of neglect to a disabled adult. The relevant statute provides:

A guardian or other person supervising the welfare of or having immediate charge, control, or custody of a disabled adult … commits the offense of neglect to a disabled adult . . . when the person willfully deprives a disabled adult . . . of health care, shelter, or necessary sustenance to the extent that the health or well-being of such person is jeopardized.

OCGA § 16-5-101 (a). "Disabled adult" is defined in relevant part as "a person 18 years of age or older who is mentally or physically incapacitated," OCGA § 16-5-100 (3), and "mentally or physically incapacitated" is defined as

16

an impairment which substantially affects an individual's ability to: (A) Provide personal protection; (B) Provide necessities, including but not limited to food, shelter, clothing, medical, or other health care; (C) Carry out the activities of daily living; or (D) Manage his or her resources.

OCGA § 16-5-100 (7.1). The indictment alleged that West willfully deprived Polizzi, a disabled adult, of health care, shelter, and necessary sustenance at the Conley Downs home to the extent that his health and well-being were jeopardized.[7]

West asserts that there was insufficient evidence that West supervised Polizzi's welfare or had immediate charge, control, or custody over him; that Polizzi was a disabled adult; or that West "deprived Polizzi of anything." Her assertions are without merit.

Construed in the light most favorable to the verdict, the evidence presented at trial and summarized above showed that West was "in charge" of the Conley Downs group home, held herself out as a caregiver employed by a personal care home

---

[7] "As we have previously explained, if a crime may be committed in more than one way, it is sufficient for the [S]tate to show that it was committed in any one of the separate ways listed in the indictment, even if, as here, the indictment uses the conjunctive rather than disjunctive form." *Brailsford v. State*, 366 Ga. App. 331, 335 (2) (882 SE2d 648) (2023) (citation and punctuation omitted). Hence, it was sufficient for the State to prove that West willfully deprived Polizzi of health care, shelter, *or* necessary sustenance.

17

company, represented to residents and their family members that rent included food and other assistance, identified herself as Polizzi's caregiver on health care forms, and exercised control and custody over Polizzi by moving him to and from her group homes. In light of this combined evidence, the jury was entitled to find that West supervised Polizzi's welfare and had immediate charge, control, or custody over him. And while there was conflicting evidence regarding whether and to what extent West agreed to provide care and supervision for Polizzi, those conflicts were for the jury, not this Court, to resolve. See *Floyd*, 321 Ga. at 720 (1).

There was also substantial evidence that Polizzi was a disabled adult. Specifically, the State presented evidence that Polizzi had extensive, serious, persistent medical problems that substantially affected his ability to provide for his own necessities, and that the Social Security Administration appointed West's daughter as the representative payee for his disability payments, indicating that he needed assistance managing his own financial resources.

Lastly, the State presented evidence showing that despite knowing of Polizzi's fragile physical condition and need for breathing equipment and a feeding tube, West failed to set up physical therapy for Polizzi after his major gastrointestinal surgery;

placed him in filthy, unsanitary, unsafe living conditions with no hot water for washing and intermittent electricity to operate his equipment; failed to supply him with sufficient nutrition for his feeding tube; and otherwise failed to provide him with the healthcare services that he needed, going so far as to warn residents not to call 911 if there was an emergency and assuring them that she would handle any problems that arose. All of this had the consequence, the evidence reflected, that Polizzi became dehydrated and malnourished, passed out from lack of oxygen, and had to be transported to the hospital emergency room for treatment. Accordingly, there was sufficient evidence that West deprived Polizzi of health care, shelter, and necessary sustenance to the extent that his health and well-being were jeopardized.

In sum, the aforementioned evidence, viewed in favor of the verdict, was sufficient to enable a rational trier of fact to find beyond a reasonable doubt that West was guilty of neglect to a disabled adult. See *Jackson*, 443 U. S. at 319 (III) (B). See also *Bonner v. State*, 369 Ga. App. 693, 697-698 (1) (b) (894 SE2d 451) (2023) (affirming conviction under OCGA § 16-5-101 (a), where evidence showed that the defendant assumed care over the victim and failed to provide her with proper

19

hydration, resulting in the victim becoming dehydrated and requiring medical attention).

(b) We turn next to West's convictions on four counts of depriving a disabled adult of essential services. OCGA § 16-5-102 (a) provides in relevant part that "[a]ny person who . . . willfully deprives of essential services a disabled adult . . . shall be guilty of a felony." "Disabled adult" is defined in OCGA § 16-5-100 (3), as discussed supra in Division 1 (a). The term "essential services" is defined as

> social, medical, psychiatric, or legal services necessary to safeguard a disabled adult's . . . rights and resources and to maintain the physical and mental well-being of such person. Such services may include, but not be limited to, the provision of medical care for physical and mental health needs, assistance in personal hygiene, food, clothing, adequately heated and ventilated shelter, and protection from health and safety hazards.

OCGA § 16-5-100 (5). The pertinent counts of the indictment alleged that West willfully deprived Johnson, Stewart, Coney, and Ridley and other residents of several essential services, including food, properly ventilated shelter, hot water for personal hygiene, electricity for lighting and safety, adequate supervision and assistance with

daily needs, and protection from health and safety hazards such as roaches and bedbugs.[8]

Without differentiating between different counts or referring to particular residents, West argues that the State failed to prove that the residents alleged in the indictment were disabled adults. West further asserts that the evidence was insufficient to prove that she willfully deprived any of the residents of essential services because the evidence failed to demonstrate that she had any duty or obligation to provide such services to them.

The evidence presented by the State and discussed above, when viewed in the light most favorable to the verdict, was sufficient to show that Johnson, Stewart, and Coney suffered from mental impairments that rendered them unable to provide basic necessities for themselves and manage their own financial resources, as reflected by their receipt of disability benefits and their reliance on designated representative payees to handle their affairs. The evidence also was sufficient to show that Ridley

---

[8] Although some counts named multiple residents, it was sufficient for the State to show that the crime was committed against any one of the residents named in a particular count. See supra footnote 6; *Brailsford*, 366 Ga. App. at 335 (2). Likewise, it was sufficient for the State to show that West willfully deprived a resident of any one of the essential services alleged in a particular count. See id.

21

suffered from Parkinson's disease and other medical conditions that rendered him unable to protect himself, provide for his own basic necessities, or carry out the activities of daily living. Under these circumstances, the jury was authorized to find that Johnson, Stewart, Coney, and Ridley each met the statutory definition of "disabled adult." See OCGA § 16-5-100 (3), (5). See also *Cawthon v. State*, 350 Ga. App. 741, 746 (1) (a) (830 SE2d 270) (2019) (concluding that evidence was sufficient to show that victim was a disabled adult, where, among other things, the victim was unable to provide basis necessities for herself or manage her own financial affairs due to her mental impairments).

As to the issue of West's duty to the residents of her homes, there was evidence that West received a direct financial benefit by having the residents stay in her group homes rather than another facility better suited for their care; that West was "in charge" of her group homes and held herself out on several occasions as a caregiver who was employed by a personal care home business; that West represented to residents and their relatives on several occasions that rent would include housing, utilities, food, and other aspects of personal care; and that West advised her residents to call her to provide assistance rather than call 911. Viewing this combined evidence

in the light most favorable to the jury's verdict, we conclude that it was sufficient to show that West assumed a duty to provide her residents with the essential services alleged in the indictment. See *Wood v. State*, 279 Ga. 667, 669-670 (1) (620 SE2d 348) (2005) (concluding, in case where the defendant was charged with felony murder and cruelty to a person who is 65 years of age or older, that the evidence supported a finding that the defendant assumed responsibility to provide healthcare and other necessary services to the victim, where the evidence showed that the defendant received a financial benefit from having the victim at his home, actively participated in the decision to have the victim brought to his home, and agreed to place the victim under his and his wife's supervision, knowing the amount of care that was needed).

(c) In contrast, we agree with West that the evidence was insufficient to support her conviction of exploitation of a disabled adult in the manner alleged in the indictment. OCGA § 16-5-102 (a) provides in relevant part that "[a]ny person who knowingly and willfully exploits a disabled adult . . . shall be guilty of a felony." "Exploit" is defined as "illegally or improperly using a disabled adult . . . or that person's resources through undue influence, coercion, harassment, duress, deception, false representation, false pretense, abuse of access, or other similar means for one's

own or another person's profit or advantage." OCGA § 16-5-100 (6). The indictment alleged that West committed the offense by illegally using the Social Security funds of one of her residents, Charlene Glass, to purchase a Dooney & Bourke handbag for her own benefit and advantage.

At trial, the State presented evidence that West used funds drawn from her bank account into which Social Security benefits of several residents had been deposited to buy the purse. In this regard, Bank records introduced by the State showed that in the month in question, a total of $2,323 in Social Security benefits from various residents, including Glass, were deposited into West's account, after which West purchased the purse for $318.86. However, the State failed to show that it was Glass's benefits in particular, rather than those of another resident, that West used to pay for the purse. Where the indictment alleges that a crime was committed in a specific manner, the State must prove that it was committed in that manner. See *Dukes v. State*, 311 Ga. 561, 572 (858 SE2d 510) (2021) (noting that the State "must prove all material allegations in an indictment which describe the offense or the particular manner in which the offense was committed"). Because the State failed to

prove that West committed the offense of exploitation of a disabled adult in the specific manner set out in the indictment, we reverse her conviction on that count.

(d) We turn now to West's challenge of her conviction of identity fraud. Pursuant to OCGA § 16-9-121 (a) (3), a person commits identity fraud when she "willfully and fraudulently . . . [u]ses or possesses with intent to fraudulently use identifying information concerning a deceased individual." "Identifying information" includes a deceased individual's name and Social Security number. OCGA § 16-9-120 (5) (A), (B). The indictment alleged that West used the name and Social Security account of one of her deceased residents, Banks, to obtain his disability benefits which should have ceased after his death.

During trial, the State presented evidence that West was appointed as the designated payee for Banks's Social Security benefits beginning in 2013. Additionally, the State presented evidence that although Banks died on January 21, 2014, West did not notify the Social Security Administration of his death[9] and instead submitted reports to the agency using Banks's name and Social Security number to facilitate her

_____

[9] A representative payee must notify the Social Security administration of any event or change in the beneficiary's circumstances affecting his or her right to receive benefits. See 20 CFR §§ 404.2035 (d), 416.635 (d).

25

continued receipt of his Social Security benefits. As a consequence, the evidence showed, Banks continued to receive and deposit or cash Banks's disability benefits checks until 2019, when the Social Security Administration learned of his death. In light of this evidence, a rational jury was entitled to find West guilty beyond a reasonable doubt of identity fraud. See *Jackson*, 443 U. S. at 319 (III) (B). See also *Anderson v. State*, 338 Ga. App. 802, 803-804 (792 SE2d 92) (2016) (affirming identity fraud conviction, where there was evidence that the defendant initially had permission to use the victim's personal identifying information, but the defendant later used that information in an unauthorized manner to obtain goods and services for himself).

2. West contends that her trial counsel rendered ineffective assistance by failing to file a general demurrer to the four counts of depriving a disabled adult of essential services. According to West, her trial counsel should have filed a general demurrer to those counts because the indictment alleged that she willfully deprived the victims of essential services by failing to provide such services to the victims, without specifically alleging that West had a duty or obligation to provide those services to them.

To succeed on her ineffective assistance claim under the test enunciated in *Strickland v. Washington*, 466 U. S. 668, 687 (II)(104 SCt 2052, 80 LE2d 674) (1984),

West must show both that her counsel's performance was constitutionally deficient and that she was prejudiced by the deficient performance. *Floyd v. State*, 321 Ga. 717, 727 (5) (917 SE2d 93) (2025). If she fails to meet her burden on either prong of the *Strickland* test, we need not examine the other prong. Id.

West has failed to show that her trial counsel performed in a constitutionally deficient manner. "To satisfy the deficiency prong, a defendant must demonstrate that [her] attorney performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Moss v. State*, 311 Ga. 123, 126 (2) (856 SE2d 280) (2021) (citation and punctuation omitted).

> And it is well established that a criminal defense attorney does not perform deficiently when he fails to advance a legal theory that would require an extension of existing precedents and the adoption of an unproven theory of law. Thus, . . . where existing precedent does not resolve the issue of whether a legal argument would support a demurrer, a defendant cannot show that trial counsel's failure to file a demurrer asserting that argument amounted to deficient performance.

*State v. Riley*, 321 Ga. 323, 328 (913 SE2d 553) (2025) (citations and punctuation omitted). Here, whether the State was required to specifically allege in the indictment that West owed a legal duty or obligation to provide essential services to the victims

27

is a novel question that has not been squarely resolved in our case law. Consequently, West cannot show that her counsel's failure to file a general demurrer constituted deficient performance. See *Tamayo v. State*, 371 Ga. App. 494, 498 (2) (c) (901 SE2d 310) (2024) (concluding that trial counsel did not perform deficiently by failing to file a general demurrer to child cruelty count, where the defendant's argument — that the count was defective because it charged him with failing to provide medical care where he owed no duty to provide such care to the victim — was novel). See also *Riley*, 321 Ga. at 328 ("Where an issue of law has not yet been squarely decided, trial counsel's failure to raise a novel legal argument does not constitute ineffective assistance of counsel." (citation and punctuation omitted)).

*Judgment affirmed in part and reversed in part. Brown, C. J., and Watkins, J., concur.*